DMP:AAS/SKW
F. #2021R00667

F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   OCT 07 2022   ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

QUANZHONG AN,
GUANGYANG AN,
     also known as "Angela An,"
TIAN PENG,
CHENGHUA CHEN,
CHUNDE MING,
XUEXIN HOU and
WEIDONG YUAN,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

INDICTMENT

Cr. No. CR 22 - 460
(T. 18, U.S.C., §§ 371, 951(a),
981(a)(1)(C), 982(a)(1), 982(b)(1),
1952(a)(3)(A), 1952(b)(i)(2), 1956(h), 2
and 3551 et seq.; T. 21, U.S.C., § 853(p);
T. 28, U.S.C., § 2461(c))

MATSUMOTO, J.

LEVY, M.J.

THE GRAND JURY CHARGES:

INTRODUCTION

At all times relevant to this Indictment, unless otherwise stated:

I.    The Defendants and Coconspirators

1.    The defendant QUANZHONG AN was a lawful permanent resident of the

United States and citizen of the People's Republic of China ("PRC") who resided in Queens,

New York and in Shandong Province, PRC.   QUANZHONG AN was the former president of an

organization based in Flushing, New York, purporting to represent persons from the Shandong

Province residing in the New York metropolitan area.   In the PRC, QUANZHONG AN headed

an investment business ("PRC Business-1"), an entity the identity of which is known to the

Grand Jury.   In the United States, QUANZHONG AN was the founder of a real estate and

development investment group ("Investment Group-1"), an entity the identity of which is known to the Grand Jury, operating in the United States and in the PRC.   QUANZHONG AN was also the majority shareholder of another investment group ("Investment Group-2"), which owned a hotel in Flushing, New York (the "Hotel"), entities the identities of which are known to the Grand Jury.   Additionally, QUANZHONG AN was a minority owner of a third investment group consortium ("Investment Consortium-1"), which owned a luxury high rise condominium in Elmhurst, Queens, as well as a holding company ("Company-1"), entities the identities of which are known to the Grand Jury.   QUANZHONG AN was approximately 55 years old in October 2022.

2.   The defendant GUANGYANG AN, also known as "Angela An," was a U.S. citizen who was born in the PRC and resided in Roslyn, New York since approximately 2003.   She was the daughter of the defendant QUANZHONG AN and was employed by the Hotel.   GUANGYANG AN was approximately 34 years old in October 2022.

3.   The defendant TIAN PENG was a citizen and resident of the PRC who was employed by the Shandong provincial office of the Central Commission for Discipline Inspection, which was called the Shandong Provincial Commission for Discipline Inspection (the "Provincial Commission").   The Central Commission for Discipline Inspection was the highest internal control institution of the Chinese Communist Party ("CCP") tasked with enforcing internal rules and regulations and combatting corruption in the CCP.   Before in or about 2022, PENG served as the Deputy Director of the 10th Review and Investigation Office of the of the Provincial Commission.   Beginning in or about 2022, PENG served as the Director of the 10th Review and Investigation Office of the Provincial Commission.

4.      The defendant CHENGHUA CHEN was a citizen and resident of the PRC.   Until in or about 2022, CHEN served as the Director of 10th Review and Investigation Office of the Provincial Commission.

5.      The defendant CHUNDE MING was a citizen and resident of the PRC. MING served as the Standing Deputy Secretary of the Provincial Commission until in or about 2022.   Since then, MING served on the PRC Standing Committee of the National People's Congress, which was the highest organ of state power and the legislature in the PRC.

6.      The defendant XUEXIN HOU was a citizen and resident of the PRC and was employed by the Provincial Commission.

7.      The defendant WEIDONG YUAN was a citizen and resident of the PRC who worked as the Deputy Director of the State Administration of Taxation in the Zaozhuang City, Central District Taxation Bureau in the PRC.

II.     Regulations for Agents of Foreign Governments

8.      An individual who acted in the United States as an agent of a foreign government was required to provide prior notification to the Attorney General, under the rules and regulations established by the Attorney General.   See 18 U.S.C. § 951(b); 28 C.F.R. §§ 73.1 et seq.

9.      The term "agent of a foreign government" included an individual who agreed to operate within the United States subject to the direction and control of a foreign government or official.   See 18 U.S.C. § 951(d).

III.    Operation Fox Hunt

10.     In or about July 2014, the government of the PRC announced "Operation Fox Hunt," an initiative by the PRC Ministry of Public Security to locate and repatriate alleged

fugitives who had fled to foreign countries, including the United States.   To advance these efforts, the PRC government took actions targeting the alleged fugitives and their families to compel cooperation with the PRC government and self-repatriation to the PRC.

11.     When conducted openly and through lawful, established channels, official foreign law enforcement activity in the United States relied upon coordination between the U.S. and the relevant foreign government, including but not limited to official extradition requests, official requests for information located in the United States, notice of any official travel by foreign officials to the United States and formal requests for foreign officials to engage in official conduct in the United States.

12.     Under Operation Fox Hunt, however, PRC government officials pursuing targets of Operation Fox Hunt traveled to the United States without providing notice to the U.S. government, and utilized assets located in the United States—frequently individuals with familial ties to the PRC—to, among other things, surveil and harass Operation Fox Hunt targets.   PRC government officials and their assets threatened the targets and their families, including family members still residing in the PRC, with harm, including incarceration, to coerce the targets' repatriation to the PRC.

13.     The PRC government lacked authority to conduct unilateral law enforcement operations within the United States without the approval of the U.S. government.

IV.    The Criminal Scheme

14.     Beginning in or about 2002, the PRC government targeted a PRC citizen residing in the Eastern District of New York, an individual whose identity is known to the Grand Jury ("John Doe-1"), with the goal of causing John Doe-1's involuntary repatriation to the PRC. John Doe-1 was on the PRC's list of top 100 priority fugitives as part of Operation Fox Hunt.

5

15.     On or about May 16, 2002, the PRC government caused the International

Criminal Police Organization ("Interpol"), an inter-governmental organization, to issue a red

notice for John Doe-1.   A red notice was a worldwide request advising Interpol member states

of a fugitive wanted by the requesting country and containing information about the fugitive's

identity and the alleged criminal conduct.   According to the red notice for John Doe-1, John

Doe-1 allegedly "t[ook] advantage of his position as the general manager of [a state-owned

corporation] [and] embezzled CNY 2 million (approximately EUR 264,941.24) of public funds

for his personal use," in violation of Chinese Criminal Law Article 382, a charge that carried a

maximum possible penalty of life imprisonment.

16.     The scheme to cause the coerced repatriation of John Doe-1 was

spearheaded by members of the Provincial Commission, including the defendants TIAN PENG,

CHENGHUA CHEN, CHUNDE MING and XUEXIN HOU.   The defendant QUANZHONG

AN, with the assistance of his daughter, the defendant GUANGYANG AN, acted as a U.S.-

based asset for the operation who interfaced directly with family members of John Doe-1.   In

2020 and 2022, QUANZHONG AN traveled to the PRC and received directives from the

Provincial Commission.   Upon returning to the United States, QUANZHONG AN

communicated messages from the Provincial Commission to the family of John Doe-1.

A.     John Doe-3's Coerced Visit to the United States

17.     As discussed below, beginning no later than 2017, the defendants and

various coconspirators forced a family member of John Doe-1 to travel from the PRC to the

United States to meet with John Doe-1's son ("John Doe-2"), an individual whose identity is

known to the Grand Jury.   During this visit, the family member ("John Doe-3"), an individual

whose identity is known to the Grand Jury, conveyed threats from the PRC government to John Doe-2 that were intended to coerce John Doe-1's return to the PRC.

18.    On or about November 13, 2017, the defendant XUEXIN HOU wrote John Doe-2 to indicate that he would be sending information about PRC policies and help him "understand how confident and determined our country is towards capturing [overseas fugitives]." XUEXIN HOU warned John Doe-2 that "coming back and turning yourself in is the only way out." XUEXIN HOU further threatened that "avoidance and wishful thinking will only result in severe legal punishments."[1]

19.    Around the same time, John Doe-2 received a message from John Doe-1's nephew ("John Doe-4"), an individual whose identity is known to the Grand Jury. John Doe-4, who resided in the PRC, indicated that he had been contacted by the defendant XUEXIN HOU to discuss John Doe-1's repatriation and asked John Doe-2 to contact XUEXIN HOU. John Doe-2, however, did not contact XUEXIN HOU as requested.

20.    A few days later, John Doe-2 received another message from John Doe-4, indicating that John Doe-4 and his brother, John Doe-3, had met with a PRC official to discuss John Doe-1. John Doe-4 warned that the PRC government had new plans to capture fugitives abroad and they "w[ould] not cease their efforts" to cause John Doe-1's repatriation to the PRC. John Doe-4 further indicated that John Doe-3 would travel to the United States soon to meet with John Doe-2 to discuss the PRC government's interest in John Doe-1.

21.    Around this time, the defendant QUANZHONG AN attempted to locate John Doe-1, to facilitate a future meeting between John Doe-1 and John Doe-3. On approximately October 24, 2017, QUANZHONG AN visited John Doe-2's residence in Long

---

[1]    All quotations of communications are translated from Mandarin Chinese into English.

Island, New York.   QUANZHONG AN asked to speak to John Doe-1, who was not home at the time.   The visit was captured by the home surveillance system of John Doe-2's residence.

22.   On or about December 13, 2017, the defendant WEIDONG YUAN, who was John Doe-3's supervisor at work, and John Doe-3 applied for temporary tourism visas to travel to the United States.   The applications sought approval to travel to the United States in January 2018 for approximately 15 days and indicated that YUAN and John Doe-3 were traveling together.   Both visa applications were denied.

23.   In approximately August 2018, the defendant WEIDONG YUAN and John Doe-3 reapplied for visas to travel to the United States.   They and their wives applied for visas to travel to the United States as part of a tourist group.   These visa applications were granted.

24.   On or about September 5, 2018, the defendant WEIDONG YUAN, John Doe-3 and their wives flew to Chicago, Illinois as part of the tourist group.   However, on or about September 8, 2018, instead of traveling from Chicago to Hawaii—the next destination on the group's itinerary—WEIDONG YUAN and John Doe-3 traveled, without their wives, to the New York metropolitan area.

25.   On or about September 8, 2018, John Doe-3 and the defendants WEIDONG YUAN and GUANGYANG AN, as well as GUANGYANG AN's husband (the "Son-In-Law"), an individual whose identity is known to the Grand Jury, traveled to John Doe-2's residence in Long Island, New York.   According to home surveillance video footage, WEIDONG YUAN, John Doe-3 and the Son-In-Law emerged from a vehicle registered to the Son-In-Law, while GUANGYANG AN stayed in the vehicle.   YUAN and John Doe-3 did not locate John Doe-1 or John Doe-2 at the residence and left after several minutes.

26.     The next day, on or about September 9, 2018, the defendant
GUANGYANG AN drove the defendant WEIDONG YUAN and John Doe-3 to John Doe-2's
residence in Long Island, New York.   According to home surveillance video footage,
WEIDONG YUAN and GUANGYANG AN looked inside the windows of the residence and
attempted to open the front door, before walking to the back of the residence, where they took
photographs of the residence and attempted to open the back door.   GUANGYANG AN reached
inside the residence's mailbox and examined John Doe-2's mail.   As depicted in the image
below, YUAN and GUANGYANG AN stood outside the residence of John Doe-2.



27.     According to home surveillance video footage, the defendant WEIDONG
YUAN first taped an envelope to the front door of John Doe-2's residence, before removing the
envelope from the front door and depositing it inside John Doe-2's mailbox.   The letter, signed
by John Doe-3, instructed John Doe-2 to contact either YUAN or the defendant GUANGYANG
AN, and provided both of their telephone numbers.   Soon after, GUANGYANG AN called John
Doe-2's telephone multiple times.   John Doe-3 also called John Doe-2 from a telephone number

associated with the Hotel to arrange a meeting with John Doe-2.   As discussed above, Investment Group-2 owned the Hotel, and QUANZHONG AN was the majority shareholder of Investment Group-2.

28.   On approximately September 11, 2018, John Doe-2 met with the defendant WEIDONG YUAN and John Doe-3 at a restaurant in Queens, New York in a meeting that was lawfully recorded.   At the start of the meeting, John Doe-2 first met alone with John Doe-3.   John Doe-3 told John Doe-2 that he had "no choice" in traveling to the United States to locate John Doe-1 and John Doe-2, and that he "dare[d] not tell [John Doe-2] much over the telephone" because he was concerned that the Provincial Commission was wiretapping both of their U.S. telephones.   John Doe-3 expressed fear in speaking with John Doe-2 and stated that they might have to speak in the bathroom to avoid being overheard.

29.   John Doe-3 explained that he had been forced to travel to Beijing, PRC to meet with a member of the Provincial Commission's Supervisory Committee to discuss his travel to the United States.   John Doe-3 stated that the PRC official had "placed pressure on him" because the PRC government wanted to "track down the most wanted 100 [fugitives] to come back to China," a group that included John Doe-1.   John Doe-3 had asked if the member of the Supervisory Committee was going to travel with him.   The official had responded that the official would not travel with John Doe-3 because the official could "get into trouble by enforcing laws" in the United States and could be detained.

30.   According to John Doe-3, the PRC government sent the defendant WEIDONG YUAN, who was John Doe-3's deputy chief at the Provincial Tax Bureau, to travel with him.   John Doe-3 stated that the Provincial Commission had paid for their trip and that the

10

Tax Bureau was providing him with a $80 daily stipend, which would be reduced every day that John Doe-3 failed to contact John Doe-2 by telephone.

31.     John Doe-3 explained that, after arriving in the United States, the defendant WEIDONG YUAN contacted the defendant GUANGYANG AN.   GUANGYANG AN then met John Doe-3 and YUAN and provided them with John Doe-2's contact information and a photograph of John Doe-2, before driving YUAN and John Doe-3 to John Doe-2's residence, where they took photographs of the home.

32.     John Doe-3 further stated that he had spoken with the defendant XUEXIN HOU two days earlier to provide an update on his efforts to contact John Doe-2.   According to John Doe-3, the defendants CHUNDE MING and CHENGHUA CHEN ran the Provincial Commission, and HOU worked for MING and CHEN.   John Doe-3 warned John Doe-2 to listen to the defendant WEIDONG YUAN but stated that John Doe-3 did not want to be involved in this matter.

33.     The defendant WEIDONG YUAN then joined the table of John Doe-2 and John Doe-3 in the restaurant.   YUAN told John Doe-2 that he had been "tasked to relay the message" to John Doe-1 that the "leadership in China would like to encourage the elite overseas Chinese to return" and that the PRC government had already caused the repatriation of 80 of the 100 most wanted fugitives.   YUAN explained that he had made "a special trip here," as John Doe-1's issue needed to be resolved "sooner or later," and John Doe-1 needed to return to the PRC.   YUAN indicated that the defendant CHUNDE MING was a deputy party leader in charge and wanted to speak to John Doe-1 directly and that the defendant CHENGHUA CHEN was managing John Doe-1's case.   YUAN warned that, since John Doe-2 lived in the U.S., John

Doe-2 might not feel the impact of John Doe-1's return to the PRC, but that "it will make a difference for the family members you still have" in the PRC.

34.     On or about September 11, 2018, the defendant GUANGYANG AN purchased airplane tickets for the defendant WEIDONG YUAN and John Doe-3 to travel on or about September 13, 2018 from John F. Kennedy International Airport in Queens, New York to Los Angeles International Airport in Los Angeles, California, which allowed them to rejoin their tour group from the PRC.

B.     The Targeting of John Doe-5

35.     In or about August 2019, the defendant TIAN PENG sent harassing communications to John Doe-1's former son-in-law ("John Doe-5"), an individual whose identity is known to the Grand Jury.   John Doe-5, who was a resident of the PRC, was previously married to John Doe-1's daughter ("Jane Doe-1"), an individual whose identity is known to the Grand Jury.

36.     Specifically, on or about August 29, 2019, John Doe-5 sent Jane Doe-1 an email, stating, in sum and substance, that the defendant TIAN PENG, whom he identified as a member of the Provincial Commission, had stopped John Doe-5 at a train station in the PRC. According to John Doe-5, PENG asked John Doe-5 to pass along a message to John Doe-1. PENG also informed John Doe-5 that the PRC had placed travel restrictions preventing John Doe-5 from leaving the PRC.

37.     In sum and substance and in part, the defendant TIAN PENG's message to John Doe-1 characterized the defendant QUANZHONG AN as a patriotic PRC native who was actively taking a lead in the efforts to repatriate John Doe-1.   In pertinent part, PENG wrote the following in Mandarin:

(a)      The PRC government is "very serious about hunting down those who have fled abroad and recovering ill-gotten gains.   They are determined to resolve the issue of returning those fugitives home.   Regardless of the price, they undoubtedly will think of all possible ways and mobilize all their powers to accomplish this goal.   So far, 60 some people out of the country's 100 fugitives on the Red Notice list have returned to the country.";

(b)      The PRC "now has a clear picture of the health, work, life and other situations of [John Doe-1] and his family.   Please refer to the situations of other returned fugitives.   Use your good judgment and decide carefully.";

(c)      "Right now under the call of the Central Committee of the Communist Party and the government, patriots in foreign lands also actively support and participate in this task.   An Quanzhong is a patriotic businessman in the U.S. and the head of the Chinese Business Association of New York.   He was originally from Zaozhuang, Shandong, and has given strong support to the government's work.   He is willing to communicate with [John Doe-1] and pay for [John Doe-1] to help the government recover the loss without anything in return.   At the same time, he is willing to provide enough funds to guarantee [John Doe-1's] return and cover his expenses needed to return home.   The government fully acknowledges his approach.   Please thoroughly consider this offer and reach out to him."; and

(d)      "The 10th Review and Investigation Office of Shandong's Commission for Discipline Inspection is in charge of this case.   They have gotten support from An Quanzhong, the patriotic businessman.   Mr. An can be contacted for specific matters . . . you can also reach out directly or indirectly to Tian Peng, the Deputy Director of the 10th Review and Investigation Office, Commission for Discipline Inspection."

38.     Between approximately November 2019 and December 2019, the

defendant TIAN PENG texted John Doe-5 about connecting the defendant QUANZHONG AN

with John Doe-1.   In these communications, PENG repeatedly asked John Doe-5 if he had been

in touch with John Doe-1.   PENG warned John Doe-5 that "things cannot stay unresolved like

this" and asked for the contact information of John Doe-1's daughter, Jane Doe-1.

39.     In approximately January 2020, the defendant TIAN PENG sent to Jane

Doe-1 an electronic request to connect over a social media platform.   PENG's profile on the

social media platform listed him as an "Official" of the "Shandong Discipline Inspection

Committee" in Jinan, Shandong, PRC.

C.     The January 2020 Recorded Meeting with QUANZHONG AN

40.     On or about December 19, 2019, a PRC state-owned corporation that

previously employed John Doe-1 (the "Corporation"), an entity the identity of which is known to

the Grand Jury, initiated suit against John Doe-1 and John Doe-2 in New York State Supreme

Court.   The lawsuit alleged that John Doe-1 stole funds from the Corporation and that John Doe-

2 had knowledge of his father's scheme and benefited from it.   In multiple lawfully recorded

meetings described below, the defendant QUANZHONG AN acknowledged that the civil suit

lacked merit and was filed at the behest of the PRC government solely to harass John Doe-1.

41.     On or about November 24, 2019, the defendant QUANZHONG AN

arrived at John F. Kennedy International Airport in Queens, New York on a flight from Beijing,

PRC.

42.     On or about January 23, 2020, the defendant QUANZHONG AN met with

John Doe-2 in Queens, New York.   The meeting was lawfully recorded.   QUANZHONG AN

began the meeting by stating that he was a member of the Standing Committee of the Chinese

People's Political Consultative Conference ("CPPCC"), which enforces rules and regulations of the Chinese Communist Party ("CCP") abroad.   The CPPCC was a political advisory body in the PRC consisting of delegates from CCP, allied front organizations and political parties subservient to the CCP.   CPPCC members often served as advisors to the PRC government, as well as legislative and judicial organs.

43.     The defendant QUANZHONG AN stated that the CPPCC was trying to contact John Doe-1 and that QUANZHONG AN had offered to help.   QUANZHONG AN admitted that, in or about 2017, he traveled to John Doe-2's home at the direction of the PRC government, to locate John Doe-1 and John Doe-2.   QUANZHONG AN further admitted that he had received the address from the PRC government.

44.     The defendant QUANZHONG AN explained that he had received instructions to contact John Doe-2 from the defendant CHENGHUA CHEN, then the Director of 10th Review and Investigation Office of the Provincial Commission, and that the defendant CHUNDE MING, the Executive Deputy Secretary of the Provincial Commission, was "in charge of the case."

45.     The defendant QUANZHONG AN then offered to pay the money that John Doe-1 purportedly owed to the PRC government to help settle the matter.   QUANZHONG AN explained that, according to the defendant CHENGHUA CHEN, if QUANZHONG AN paid back the money that John Doe-1 purportedly owed and John Doe-1 returned to the PRC, John Doe-1 would not have to be detained.   QUANZHONG AN stated that the defendant CHUNDE MING agreed with the proposed resolution.   QUANZHONG AN further claimed to have proposed to the Provincial Commission that John Doe-1 could stay in QUANZHONG AN's home once he returned to the PRC.   In addition, QUANZHONG AN stated that CHEN had

"promised" to withdraw the civil lawsuit against John Doe-1 and John Doe-2 if John Doe-1 returned to the PRC.   QUANZHONG AN offered to conduct a joint call with MING to discuss the proposal.

46.     John Doe-2 asked why the defendant QUANZHONG AN would be willing to pay the fine on John Doe-1's behalf.   QUANZHONG AN responded that he had donated over 100 million yuan to the PRC government the previous year and that the PRC government "will be very happy if this thing is settle[d]."   QUANZHONG AN boasted that, if he assisted with John Doe-1's repatriation, the PRC government "will not see [QUANZHONG AN] as a bad guy because [he has] done so many good things, even donating money to society." Referencing Operation Fox Hunt, QUANZHONG AN stated his belief that the PRC government's repatriation program was motivated by the PRC government's need to "save their faces" and have the 100 most wanted fugitives returned.   QUANZHONG AN stated that each province in the PRC needed to achieve their "allocated assignment" and, if the local officials failed, "they can no longer stay in their positions."

47.     John Doe-2 asked if the defendants CHENGHUA CHEN or CHUNDE MING had articulated potential consequences if John Doe-1 failed to return to the PRC.   The defendant QUANZHONG AN responded that he did not want to pronounce such "ruthless words," but indicated that that CHEN would "keep pestering you, [and] make your daily life uncomfortable."   QUANZHONG AN warned that the PRC government had also "targeted and monitored" John Doe-1's relatives in the PRC.

D.     The July 2021 Recorded Meetings with QUANZHONG AN

48.     On or about June 9, 2021, the defendant QUANZHONG AN arrived at John F. Kennedy International Airport in Queens, New York on a trip originating from Beijing, PRC.

16

49.     On or about July 1, 2021, the defendant QUANZHONG AN solicited another meeting with John Doe-2 in Queens, New York.   The meeting was lawfully recorded. QUANZHONG AN stated that he recently spoke to the defendant CHUNDE MING, who had asked if QUANZHONG AN had been in recent touch with John Doe-2.   According to QUANZHONG AN, MING had mentioned another individual in Canada who agreed to repatriate to the PRC despite initially not wanting to go back (the "Canadian Victim"), an individual whose identity is known to the Grand Jury.   QUANZHONG AN claimed that the charges were dropped against the Canadian Victim, and that John Doe-2 could speak to the Canadian Victim if he wanted.   QUANZHONG AN reiterated that MING wanted to speak to John Doe-1 on the telephone.

50.     The defendant QUANZHONG AN then admitted that the lawsuit brought by the PRC state-owned corporation against John Doe-1 and John Doe-2 in the New York State Supreme Court was frivolous and paid for by the PRC government to coerce John Doe-1's return to the PRC.   QUANZHONG AN acknowledged that "they are still suing you to place additional pressure on you" and "will keep pestering you through a lawsuit" because the cost of it "really is a drop in the bucket for a country to spend $1 billion or $0.8 billion to meet the political task assigned by the Central Government."   QUANZHONG AN further stated that "it will be an endless misery" for John Doe-1 and John Doe-2 to defend themselves.   In response, John Doe-2 asked if the PRC government would use other means to pressure him.   QUANZHONG AN replied that "they will definitely find new ways to bother you" and "it is definitely true that all of your relatives will be involved."

51.     The defendant QUANZHONG AN repeated his offer to pay John Doe-1's fine and provide him housing if he repatriated to the PRC.   QUANZHONG AN promised that, if

John Doe-1 returned, John Doe-1 would not be detained.   QUANZHONG AN also acknowledged how his business interests prompted his involvement in John Doe-1's case. QUANZHONG AN explained, "[A]s you know, there are many ways to make it work in China. It's hard to do business in China."   QUANZHONG AN claimed that he had succeeded by making donations to the PRC government.   QUANZHONG AN further claimed that "he had donated over 300 million yuan over the years to the PRC government."

52.   The defendant QUANZHONG AN ended the meeting by showing John Doe-2 a photograph on his telephone of a document purportedly from the PRC government. The document accused John Doe-1 of embezzling public funds but stated that, if John Doe-1 returned to the PRC and confessed, "his punishment may be reduced, and he may be exempted from criminal punishment."   QUANZHONG AN threatened that, if John Doe-1 refused to return, the PRC government will "spend whatever it takes no matter [if] it's going to be 1 or 10 million dollars to pursue it."

53.   On or about July 20, 2021, the defendant QUANZHONG AN requested another meeting with John Doe-2 in Queens, New York.   The meeting was lawfully recorded.

54.   John Doe-2 began the meeting by thanking the defendant QUANZHONG AN for hosting his cousin, John Doe-3, and his cousin's colleague, when they traveled to the U.S. in September 2018, to "deliver[] the same message as the one [QUANZHONG AN] shared" about repatriating to the PRC.   Referring to the defendant WEIDONG YUAN, QUANZHONG AN asked if John Doe-2 meant the "colleague from the tax bureau" who "came with your cousin."

55.   The defendant QUANZHONG AN repeated the proposal for John Doe-1 to return to the PRC without the possibility of detention.   QUANZHONG AN stated that the

PRC government had sent a letter to QUANZHONG AN's office promising leniency for John Doe-1 if he if returned.   QUANZHONG AN then showed John Doe-2 a photograph of the purported letter saved on his telephone.

56.     Referring to the civil litigation against John Doe-1 and John Doe-2, the defendant QUANZHONG AN stated that, if John Doe-1 did not agree to the purported proposal, "the lawyers will keep calling you and make your life uneasy."   Admitting again that the Corporation's suit against John Doe-1 and John Doe-2 was frivolous, QUANZHONG AN stated that the PRC government officials "don't really care if they can establish a case here, it's beyond that point, their intent is to make your life difficult with the political assignment they received." QUANZHONG AN stated that "the only objective for [the PRC government] to pursu[e] the indictment here is to make your life difficult."   According to QUANZHONG AN, "there are plenty of people who just sit there [who work for the PRC government] with tea and come up with different stories as part of their job."   QUANZHONG AN stated that the PRC government "will keep bugging you to distract you from work."

57.     The defendant QUANZHONG AN further explained that the PRC government selected QUANZHONG AN "to be the one to make [the repatriation] happen." QUANZHONG AN stated that "it will make [him] feel good if [he] can deliver the task successfully by making it happen" and "it makes [him] look good."   Later, QUANZHONG AN admitted that, "if the thing can be coordinated well, at least they will recognize me.   They would say QUANZHONG AN is a reliable person since I have resolved your dad's case.   They would not only recognize what I have done in the past but what I am capable of now from the way I handle this case."

58.     The defendant QUANZHONG AN then reiterated that he had discussed the case with the defendant CHUNDE MING, who reportedly wanted to speak with John Doe-1 himself.

E.      The 2022 Recorded Meetings with QUANZHONG AN

59.     On or about June 5, 2022, the defendant QUANZHONG AN arrived at John F. Kennedy International Airport in Queens, New York on a flight from Beijing, PRC.

60.     On or about July 12, 2022, the defendant QUANZHONG AN met with John Doe-2 in Queens, New York.   The meeting, which QUANZHONG AN had solicted, was lawfully recorded.

61.     During the meeting, the defendant QUANGZHONG AN relayed to John Doe-2 that the defendant CHUNDE MING, whom QUANZHONG AN indicated had previously offered to speak directly with John Doe-2 about John Doe-1's case, had left to work for the Standing Committee of the National People's Congress.   QUANGZHONG AN identified the new leader as a former top minister in Qingdao Province who was reportedly offering to meet with John Doe-1 in a third-party country.   He claimed that the purpose of such a meeting would be to establish trust.   QUANGZHONG AN further indicated that the defendant CHENGHUA CHEN had also left his post and that his replacement was the defendant TIAN PENG.

62.     After John Doe-2 asked whether John Doe-1 could return to the United States if he agreed to travel to the PRC, the defendant QUANGZHONG AN indicated that John Doe-1 could apply for such a return in several months.   After John Doe-2 asked what would happen if John Doe-1 did not return to the PRC, QUANGZHONG AN stated, "Then they will find some things on you, non-stop keep looking for things," and suggested that the PRC authorities would "add" to the case.   When John Doe-2 asked for clarification as to what might

be added, QUANGZHONG AN stated that perhaps John Doe-2 was not familiar with how things worked in the PRC.   He stated that John Doe-1's family in the PRC would encounter difficulties: "They will try to make trouble.   Since you're here, they won't be able to come here, do anything to you.   They will do this . . . .   One, the people in China, they will . . . definitely have trouble."   Even if John Doe-1's relatives in the PRC did not exit their homes, "things can still happen."

63.    As to the proposal, the defendant QUANGZHONG AN stated that "they will charge the old man, but other things will not exist."   He clarified that the Corporation's lawsuit would disappear.   QUANZGHONG AN offered for PRC leadership working on the case to come meet John Doe-1 in Toronto, Canada.   He further indicated that the PRC government would not likely send someone again to the United States to meet with John Doe-2.   He emphasized the desire of the PRC team to meet with John Doe-1 to reach an agreement. QUANGZHONG AN stated that the matter could not be settled with a monetary payment; John Doe-1 needed to travel to the PRC.   According to QUANZHONG AN, the current offer of agreeing not to prosecute John Doe-1 was a great opportunity, given the present political climate.

64.    On or about July 20, 2022, the defendant QUANZHONG AN called John Doe-2 and indicated that he would arrange for John Doe-2 to speak telephonically with a person from the PRC government working on John Doe-1's case.   QUANGZHONG AN indicated that the call would take place the following day at the Hotel.

65.    On or about July 21, 2022, John Doe-2 traveled to the Hotel to meet with the defendant QUANZHONG AN.   There, QUANZHONG AN called the defendant TIAN PENG on speakerphone in a lawfully recorded conversation.   During the call, PENG identified himself as the Director of the 10th Review and Investigation Office of the Provincial

Commission and indicated that QUANZHONG AN had been involved in the case for many

years and had passed along information obtained from John Doe-2 to the PRC authorities.

PENG indicated that the PRC government had consistently sought to enforce the policy on

Operation Fox Hunt, which had resulted in the repatriation of 61 individuals to the PRC,

including more than a dozen individuals from John Doe-1's province, most of whom had first

met with PRC authorities in third countries.

66.     During the call, the defendant TIAN PENG stated that the defendant

XUEXIN HOU had not handled John Doe-1's case well and that things had improved after

PENG assumed control over the case from HOU approximately three to four years ago.   PENG

indicated that he had a very good relationship with the defendant QUANGZHONG AN,

including a "complete trust in him."

67.     The defendant TIAN PENG stated that, previously, PENG had allowed the

defendant QUANZHONG AN to show John Doe-2 an unofficial legal document pertaining to

the terms of a proposed disposition of John Doe-1's case; all the terms were made after thorough

deliberations but were not yet officially approved.   PENG assured John Doe-2 that the terms of

the proposal would be fulfilled as with a contractual agreement.   PENG added that John Doe-1

would not face any criminal punishment, but that John Doe-1 needed to return to the PRC:

> [T]here is certainly no criminal punishment in China.   Why, you ask, does the
> old man [John Doe-1] have to come back?   Because . . . he had to deal with
> this . . . there is this number, that is, to deal with the elimination of the number,
> right?   If you don't eliminate the number, um, some—some of the previous,
> some of the measures taken against the old man and you in China cannot be
> resolved. . . . Now, for you, it would be very inconvenient to come back to China
> if you want to return. . . .   It is also inconvenient for the old man to come back.
> These—these problems can only be solved through our legitimate legal
> approach . . . .

PENG further indicated that the PRC officials would not travel to the United States to avoid creating issues between the PRC and the United States: "There's no way we could go . . . and take whatever measures, which would be a matter between the two countries."

68.   The defendant TIAN PENG stated that the 20th National Congress of the CCP would be held in the latter half of 2022 and suggested that, as the PRC government's policies change every five years, any changes in policies may negatively affect John Doe-1: "In case there is a change, I am afraid that it doesn't work in favor of the old man."

69.   In the same conversation, the defendant QUANGZHONG AN stated that he had previously shown to John Doe-2 a photo of the official policy document that the defendant TIAN PENG had referred to, and that John Doe-1 would remain in the PRC for at most 40 days but would not "go in prison, go inside," that is, he would not be detained.   PENG concurred that John Doe-1 would not be detained.   QUANGZHONG AN and PENG both stated that, as the matter was a county-level case, it would be resolved more quickly than a provincial level case.   QUANGZHONG AN and PENG both confirmed that the case would be resolved with a guilty plea to misappropriation, a disposition that would not require surrender of any assets by John Doe-1.

70.   The defendant QUANGZHONG AN concluded the conversation by indicating that, upon a successful resolution of the matter, John Doe-1's family could travel freely to and from the PRC.   He stated that he had not yet shown John Doe-2 a document about procedures involved in John Doe-1's case, which the defendant TIAN PENG explained was missing some words that could not be put in writing because of confidentiality rules.

71.   After the telephone call with the defendant TIAN PENG concluded, the defendant QUANGZHONG AN stated that the document from PENG was not very specific and

did not clearly promise John Doe-1 an agreement not to prosecute and an agreement not to seize funds.   After John Doe-2 asked about the functions of the "International Cooperation Bureau," QUANGZHONG AN stated that it sets the policies, while the local authorities enforce the polices; he added that he was personally acquainted with the leader of the Bureau, which was focused on capturing the 129 most wanted fugitives from the PRC.   QUANGZHONG AN indicated that, should John Doe-1 agree to return to the PRC, the decision would be communicated to higher levels of the PRC government.   John Doe-2 promised to consult with John Doe-1 and to respond to QUANGZHONG AN sometime soon.

72.     On or about August 19, 2022, John Doe-2 met in Queens, New York with the defendant QUANZHONG AN in a lawfully recorded meeting.   During the meeting, QUANZHONG AN provided a telephone number and indicated that the number belonged to the Canadian Victim, who was then in Vancouver, Canada.

73.     Thereafter, the defendant QUANZHONG AN called the defendant TIAN PENG and allowed John Doe-2 to speak with PENG.   QUANZHONG AN informed PENG that he had provided the Canadian Victim's telephone number to John Doe-2.

74.     The defendant TIAN PENG indicated that John Doe-2 could contact the Canadian Victim.   PENG indicated that he did not handle the Canadian Victim's case, which was handled by Jinan City, referring to a city in the PRC.   PENG further indicated that the process would be the same for John Doe-1.   According to PENG, an uncle was involved in communicating with the Canadian Victim and that the uncle engaged an agriculture specialist from Jinan to travel to Canada to temporarily take care of the Canadian Victim's farm in Canada while the Canadian Victim went back to the PRC.

75.     After the call with the defendant TIAN PENG concluded, John Doe-2 told the defendant QUANZHONG AN that he wanted to find out from the Canadian Victim about the process and the arrangement involved, as well as the treatment of the Canadian Victim in the PRC and whether the Canadian Victim encountered any problem in leaving the PRC, since the Canadian Victim was also listed in a red notice.

76.     John Doe-2 then asked if the Canadian Victim had any other charges against him or received a suspended sentence after the Canadian Victim returned to the PRC. The defendant QUANZHONG AN indicated that he did not inquire in depth regarding the Canadian Victim but was aware that the Canadian Victim returned to PRC and that everything was resolved.   According to QUANZHONG AN, the Canadian Victim was thereafter able to travel freely, and his business prospered.

77.     The defendant QUANZHONG AN told John Doe-2 that, once the matter involving John Doe-1 was resolved, John Doe-1 would be exonerated, and a burden would be removed.   QUANZHONG AN stated that John Doe-1 could return to the United States from the PRC, absent any pending prosecution.   He added that the Canadian Victim was presently in Vancouver, Canada and that, if John Doe-2 wanted to meet the Canadian Victim in person, whether in the United States or Canada, QUANZHONG AN could help arrange a meeting.

78.     On or about August 27, 2022, John Doe-2 called the Canadian Victim in a lawfully recorded telephone call, using the telephone number provided to him by the defendant QUANZHONG AN.   During the call, John Doe-2 indicated that he had received directions from the defendant TIAN PENG and QUANZHONG AN to call the Canadian Victim, and that the purpose of the call was for John Doe-2 to learn about the Canadian Victim's experience when the Canadian Victim returned to the PRC.

79.     The Canadian Victim explained that his case was handled at the district level when he returned to the PRC at the end of 2018.   The process included an arrest by Ministry of Public Security (which he referred to as "Public Security"), followed thereafter by an adjudication of guilt without punishment.   According to the Canadian Victim, the entire process was coordinated by the Central Commission for Discipline Inspection.   The Canadian Victim was initially told that the process would last approximately two weeks, but the process lasted more than 40 days because of the arrest in Canada pursuant to an extradition warrant from the United States of an executive from a PRC technology company.   The Canadian Victim confirmed that he was neither detained nor mistreated while in the PRC, and he returned to Canada after the verdict.   He indicated that the case was closed in the PRC and that no one had bothered him subsequently.

80.     After John Doe-2 asked about the International Cooperation Bureau's role—considering the defendant QUANZHONG AN's indication that the case must proceed to the Bureau for final resolution— the Canadian Victim responded that, after a case was processed at the provincial level, the local office of the Ministry of Public Security would report the matter to the International Cooperation Bureau within the Ministry of Public Security.   Subsequently, the International Cooperation Bureau would notify Interpol to have the name removed from the red notice.

81.     At the end of the call, John Doe-2 stated that he was a U.S. citizen without close relatives or assets in the PRC.   Therefore, John Doe-2 stated, he was still assessing the necessity of returning to the PRC to settle the case.   John Doe-2 also complained about how the PRC used relatives and other people to pressure and threaten him to coerce his return.   The

Canadian Victim agreed the PRC government would employ such methods because they were very effective.

      F.      The Money Laundering Scheme

      82.      From in or about 2016 through the present, the defendants QUANZHONG AN and GUANGYANG AN conspired with others to engage in a money laundering scheme. During this period, the conspirators sent and caused to be sent millions of dollars in wire transfers from the PRC to the United States.   As these activities violated applicable PRC law regarding capital flight—which imposed a limit of $50,000 per person annually for total foreign exchange settlement—the conspirators engaged in deceptive tactics designed to frustrate and impede the Anti-Money Laundering ("AML") controls of the U.S. financial institutions, so that the defendants and the coconspirators could enjoy continued access to the U.S.-based bank accounts.

      83.      The conspirators used international wire payments passing from the PRC to the United States via the real-time gross settlement funds transfer system operated by the U.S. Federal Reserve Bank called Fedwire.   The communications underlying the actual payments were referred to as "Originator to Beneficiary Information" ("OBI").   U.S. financial institutions processing international transactions regularly screened OBI messages of wire payments to avoid executing transactions in violation of applicable law.

      84.      The defendants and their coconspirators took various measures to obscure ownership and control of the laundered funds, including by (1) using more than 50 third parties to initiate transactions from the PRC to the United States of $40,000 to $50,000 (including Persons #1 through #55, as well as Company #1), individuals and entities the identities of which are known to the Grand Jury; (2) receiving funds wired from the PRC in various personal

accounts associated with the defendants or their relatives, including the Son-In-Law, an individual whom the defendant GUANGYANG AN identified to U.S. financial institutions as her sister (the "Associate"), the Associate's husband (the "Husband"), and one of the defendant QUANZHONG AN's ex-wives (the "Ex-Wife"), all individuals whose identities are known to the Grand Jury; (3) falsely stating the purposes of the transactions in OBI messages; (4) engaging in layering transactions involving personal and corporate accounts controlled by the conspirators; and (5) making materially false statements when asked by U.S. financial institutions about the purpose of the transactions, claiming, for example, that the purposes of the transactions were for tuition, loan repayment, or travel expenses.   These deceptive tactics caused U.S. financial institutions to incur risk of civil and criminal liability

85.    The chart below lists the approximate dates, senders, initial recipients, the amounts and the OBI messages in wire transfers from the PRC to the United States of $40,000 to $50,000.

| Date | Sender | Initial Recipient | Amount | OBI Message |
|------|--------|-------------------|--------|-------------|
| 7/6/2016 | Person #1 | The Son-In-Law | $50,000 | |
| 11/7/2016 | Person #2 | The Son-In-Law | $49,980 | |
| 11/7/2016 | Person #3 | GUANGYANG AN | $50,000 | |
| 11/14/2016 | Person #4 | The Son-In-Law | $49,680 | |
| 11/16/2016 | Person #5 | GUANGYANG AN | $50,000 | |
| 11/28/2016 | Person #6 | The Son-In-Law | $50,000 | |
| 11/28/2016 | The Ex-Wife | The Son-In-Law | $50,000 | |
| 12/27/2016 | Person #7 | The Son-In-Law | $48,000 | |
| 1/3/2017 | Company #1 | GUANGYANG AN | $42,260.14 | |
| 4/5/2017 | Person #8 | The Associate | $50,000 | |
| 4/5/2017 | Person #9 | The Associate | $49,985 | |
| 4/5/2017 | Person #10 | The Associate | $41,985 | |
| 6/19/2017 | Person #7 | The Son-In-Law | $49,990 | |
| 6/20/2017 | Person #11 | The Son-In-Law | $49,980 | |
| 9/6/2017 | Person #12 | The Ex-Wife | $49,990 | "Tuition Fee |
| 9/6/2017 | Person #13 | The Ex-Wife | $42,790 | "Living Expense Tuition" |
| 9/7/2017 | Person #14 | GUANGYANG AN | $49,990 | "Cost living" |
| 9/7/2017 | Person #15 | GUANGYANG AN | $49,985 | |

| Date | Sender | Initial Recipient | Amount | OBI Message |
|---|---|---|---|---|
| 9/7/2017 | Person #16 | The Associate | $49,985 | |
| 11/10/2017 | Person #17 | The Son-In-Law | $49,990 | |
| 11/10/2017 | Person #18 | The Son-In-Law | $47,990 | |
| 12/7/2017 | Person #19 | The Son-In-Law | $48,490 | |
| 12/7/2017 | Person #20 | The Son-In-Law | $49,990 | |
| 12/14/2017 | Person #21 | The Son-In-Law | $49,990 | |
| 12/27/2017 | Person #22 | The Son-In-Law | $49,990 | |
| 1/16/2018 | Person #23 | The Associate | $49,960 | |
| 1/16/2018 | Person #24 | The Associate | $49,985 | |
| 1/16/2018 | Person #25 | The Associate | $49,985 | |
| 1/17/2018 | Person #26 | QUANZHONG AN | $49,984 | |
| 1/17/2018 | Person #27 | QUANZHONG AN | $49,985 | |
| 1/17/2018 | Person #28 | QUANZHONG AN | $49,990 | |
| 1/25/2018 | Person #29 | QUANZHONG AN | $49,985 | |
| 1/25/2018 | Person #30 | QUANZHONG AN | $49,985 | |
| 1/25/2018 | Person #31 | GUANGYANG AN | $49,985 | |
| 1/25/2018 | Person #32 | GUANGYANG AN | $49,985 | |
| 1/25/2018 | Person #32 | GUANGYANG AN | $49,985 | |
| 1/26/2018 | Person #33 | GUANGYANG AN | $49,985 | |
| 1/26/2018 | Person #34 | QUANZHONG AN | $49,985 | |
| 1/26/2018 | Person #35 | QUANZHONG AN | $49,985 | |
| 4/9/2018 | Person #36 | The Associate | $49,975 | |
| 4/9/2018 | Person #37 | The Associate | $49,985 | |
| 4/9/2018 | Person #38 | The Associate | $49,985 | |
| 4/9/2018 | Person #39 | The Associate | $49,985 | |
| 1/7/2019 | Person #40 | The Associate | $49,185 | |
| 3/12/2019 | Person #41 | The Associate | $49,985 | |
| 3/14/2019 | Person #42 | The Associate | $49,985 | |
| 3/14/2019 | Person #43 | The Husband | $49,985 | |
| 8/19/2019 | Person #44 | The Associate | $49,565 | |
| 1/17/2020 | Person #45 | The Ex-Wife | $49,985 | "Travel" |
| 1/17/2020 | Person #46 | The Ex-Wife | $49,890 | "Huankuan" |
| 1/17/2020 | Person #47 | The Ex-Wife | $47,990 | "Travel Fee Rmtr Dob 19580825" |
| 1/21/2020 | Person #48 | The Ex-Wife | $50,000 | "Tour Fee" |
| 2/18/2020 | Person #49 | The Associate | $49,788 | "TRAVELRMTR DOB 19870516" |
| 2/18/2020 | Person #50 | The Associate | $49,800 | "Travel" |
| 2/18/2020 | Person #51 | The Associate | $49,985 | "Travel" |
| 8/13/2020 | Person #52 | The Son-In-Law | $49,975 | "BBI: {6500} BBK INFO: FAMILY SUPPORT" |
| 10/9/2020 | Person #53 | The Husband | $49,880 | "Xuefei" |

| Date | Sender | Initial Recipient | Amount | OBI Message |
|------|--------|-------------------|--------|-------------|
| 1/4/2021 | GUANGYANG AN | GUANGYANG AN | $48,990 | |
| 1/12/2021 | Person #54 | GUANGYANG AN | $48,990 | "Tuition BNF37040319880 3096124" |
| 1/13/2021 | Person #55 | The Son-In-Law | $48,985 | |

86.     The conspirators controlled the laundered funds.   Funds transferred from the PRC were frequently used by the defendants QUANZHONG AN and GUANGYANG AN for their personal or business purposes, including to pay personal credit card debt, mortgages on the defendants' residences in Roslyn, New York, mortgages on the Hotel and tax liability.

COUNT ONE
(Conspiracy to Act as Agents of a Foreign Government)

87.     The allegations contained in paragraphs one through 86 are realleged and incorporated as if fully set forth in this paragraph.

88.     In or about and between January 2017 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants QUANZHONG AN, TIAN PENG, CHENGHUA CHEN, CHUNDE MING, XUEXIN HOU and WEIDONG YUAN, together with others, did knowingly and intentionally conspire to act in the United States as agents of a foreign government, to wit: the PRC government, without prior notification to the Attorney General of the United States, as required by law, contrary to Title 18, United States Code, Section 951(a).

89.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants QUANZHONG AN, TIAN PENG, CHENGHUA CHEN, CHUNDE MING, XUEXIN HOU and WEIDONG YUAN, together with others, did commit and cause the commission of, among others, the following:

OVERT ACTS

(a)     On or about December 13, 2017, YUAN applied for a temporary tourism visa to travel to the United States.

(b)     On or about August 6, 2018, YUAN applied for a temporary tourism visa to travel to the United States.

(c)     On or about September 8 and 9, 2018, YUAN and John Doe-3 traveled to John Doe-2's residence in Long Island, New York to surveil John Doe-2's home and solicit a meeting with John Doe-2.

(d)     On approximately September 11, 2018, YUAN and John Doe-3 met with John Doe-2 at a restaurant in Queens, New York.

(e)     On or about January 23, 2020, AN met with John Doe-2 in Queens, New York.

(f)     On or about July 1, 2021, AN met with John Doe-2 in Queens, New York.

(g)     On or about July 20, 2021, AN met with John Doe-2 in Queens, New York.

(h)     On or about July 12, 2022, AN with John Doe-2 in Queens, New York.

(i)     On or about July 21, 2022, AN initiated a speakerphone call between PENG and John Doe-2.

(Title 18, United States Code, Sections 371 and 3553 et seq.)

COUNT TWO
(Acting as Agents of a Foreign Government)

90.     The allegations contained in paragraphs one through 86 are realleged and incorporated as if fully set forth in this paragraph.

91.     In or about and between January 2017 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants QUANZHONG AN and WEIDONG YUAN, together with others, did knowingly and intentionally act in the United States as agents of a foreign government, to wit: the PRC government, without prior notification to the Attorney General of the United States, as required by law.

(Title 18, United States Code, Sections 951(a), 2 and 3551 et seq.)

COUNT THREE
(Travel Act Violation)

92.     The allegations contained in paragraphs one through 86 are realleged and incorporated as if fully set forth in this paragraph.

93.     On or about September 5, 2018, within the Eastern District of New York and elsewhere, the defendant WEIDONG YUAN, together with others, did knowingly and intentionally travel in interstate and foreign commerce, to wit: from the PRC to Long Island, New York, with intent to promote, manage, establish, carry on and facilitate the promotion,

management, establishment and carrying on of unlawful activity, to wit: extortion under New York Penal Law Section 135.60 (Coercion in the Third Degree).

(Title 18, United States Code, Sections 1952(a)(3)(A), 1952(b)(i)(2), 2 and 3551 et seq.)

## COUNT FOUR
(Travel Act Violation)

94.     The allegations contained in paragraphs one through 86 are realleged and incorporated as if fully set forth in this paragraph.

95.     On or about November 24, 2019, within the Eastern District of New York and elsewhere, the defendant QUANZHONG AN, together with others, did knowingly and intentionally travel in interstate and foreign commerce, to wit: from the PRC to John F. Kennedy International Airport, with intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of unlawful activity, to wit: extortion under New York Penal Law Section 135.60 (Coercion in the Third Degree).

(Title 18, United States Code, Sections 1952(a)(3)(A), 1952(b)(i)(2), 2 and 3551 et seq.)

## COUNT FIVE
(Travel Act Violation)

96.     The allegations contained in paragraphs one through 86 are realleged and incorporated as if fully set forth in this paragraph.

97.     On or about June 9, 2021, within the Eastern District of New York and elsewhere, the defendant QUANZHONG AN, together with others, did knowingly and willfully travel in interstate and foreign commerce, to wit: from the PRC to John F. Kennedy International Airport, with intent to promote, manage, establish, carry on and facilitate the promotion,

33

management, establishment and carrying on of unlawful activity, to wit: extortion under New York Penal Law Section 135.60 (Coercion in the Third Degree).

(Title 18, United States Code, Sections 1952(a)(3)(A), 1952(b)(i)(2), 2 and 3551 et seq.)

## COUNT SIX
(Travel Act Violation)

98.    The allegations contained in paragraphs one through 86 are realleged and incorporated as if fully set forth in this paragraph.

99.    On or about June 5, 2022, within the Eastern District of New York and elsewhere, the defendant QUANZHONG AN, together with others, did knowingly and willfully travel in interstate and foreign commerce, to wit: from the PRC to John F. Kennedy International Airport, with intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of unlawful activity, to wit: extortion under New York Penal Law Section 135.60 (Coercion in the Third Degree).

(Title 18, United States Code, Sections 1952(a)(3)(A), 1952(b)(i)(2), 2 and 3551 et seq.)

## COUNT SEVEN
(Conspiracy to Engage in Interstate Harassment)

100.    The allegations contained in paragraphs one through 86 are realleged and incorporated as if fully set forth in this paragraph.

101.    In or about and between January 2017 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants QUANZHONG AN, GUANGYANG AN, also known as "Angela An," TIAN PENG, CHENGHUA CHEN, CHUNDE MING, XUEXIN HOU and WEIDONG YUAN,

together with others, did knowingly and intentionally conspire to travel in interstate and foreign commerce, with the intent to harass and intimidate one or more persons, to wit: John Doe-1, John Doe-2 and John Doe-3, and in the course of and as a result of such travel, to engage in conduct that would cause, would attempt to cause and would be reasonably expected to cause those individuals substantial emotional distress, contrary to Title 18, United States Code, Section 2261A(1)(B).

102.    In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants QUANZHONG AN, GUANGYANG AN, also known as "Angela An," TIAN PENG, CHENGHUA CHEN, CHUNDE MING, XUEXIN HOU and WEIDONG YUAN, together with others, did commit and cause the commission of, among others, the following:

OVERT ACTS

(a)    On or about November 13, 2017, HOU wrote John Doe-1 to indicate that he would be sending information about PRC policies to help John Doe-1 "understand how confident and determined our country is towards capturing [overseas fugitives]." HOU warned John Doe-1 that "coming back and turning yourself in is the only way out." HOU further threatened that "avoidance and wishful thinking will only result in severe legal punishments."

(b)    On or about December 13, 2017, YUAN applied for a temporary tourism visa to travel to the United States.

(c)    On or about August 8, 2018, YUAN applied for a temporary tourism visa to travel to the United States.

(d)      On or about September 5, 2018, YUAN and John Doe-3 traveled from the PRC to Chicago, Illinois.

(e)      On or about September 8, 2018, GUANGYANG AN, YUAN and John Doe-3 traveled to John Doe-2's residence in Long Island, New York.

(f)      On or about September 9, 2018, GUANGYANG AN drove YUAN and John Doe-3 to John Doe-2's residence in Long Island, New York to surveil John Doe-2's home and solicit a meeting with John Doe-2.   GUANGYANG AN called John Doe-2 multiple times.

(g)      On approximately September 11, 2018, YUAN and John Doe-3 met with John Doe-2 at a restaurant in Queens, New York.

(h)      In or about August 2019, PENG advised John Doe-5 that PENG had imposed travel restrictions preventing John Doe-5 from leaving the PRC.

(i)      On or about December 19, 2019, the Corporation initiated suit against John Doe-1 and John Doe-2 in New York State Supreme Court.

(j)      On or about January 23, 2020, QUANZHONG AN met with John Doe-2 in Queens, New York.

(k)      On or about July 1, 2021, QUANZHONG AN met with John Doe-2 in Queens, New York.

(l)      On or about July 20, 2021, QUANZHONG AN met with John Doe-2 in Queens, New York.

(m)      On or about July 12, 2022, QUANZHONG AN met with John Doe-2 in Queens, New York.

    (n)  On or about July 21, 2022, PENG spoke telephonically with John

Doe-2.

    (Title 18, United States Code, Sections 371 and 3551 et seq.)

COUNT EIGHT
(Money Laundering Conspiracy)

    103. The allegations contained in paragraphs one through 86 are realleged and

incorporated as if fully set forth in this paragraph.

    104. In or about and between January 2016 and the present, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants QUANZHONG AN and GUANGYANG AN, also known as "Angela An," did

knowingly and intentionally conspire to transport, transmit and transfer monetary instruments

and funds, to wit: wire transfers, to a place in the United States from and through a place outside

the United States, with the intent to promote the carrying on of specified unlawful activity, to

wit: bank fraud, in violation of Title 18, United States Code, Section 1344(1), contrary to Title

18, United States Code, Section 1956(a)(2)(A).

    (Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS THREE THROUGH SIX

    105. The United States hereby gives notice to the defendants charged in Counts

Three through Six that, upon their conviction of any such offenses, the government will seek

forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28,

United States Code, Section 2461(c), which require any person convicted of such offenses to

forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or

indirectly as a result of such offenses.

106.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

    (a)    cannot be located upon the exercise of due diligence;

    (b)    has been transferred or sold to, or deposited with, a third party;

    (c)    has been placed beyond the jurisdiction of the court;

    (d)    has been substantially diminished in value; or

    (e)    has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNT EIGHT

107.    The United States hereby gives notice to the defendants charged in Count Eight that, upon their conviction of such offense, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property, including but not limited to: (a) the real property and premises located at the ███ and all proceeds traceable thereto; (b) the real property and premises located at ███ ███ and all proceeds traceable thereto; and (c) ███ ███, and all proceeds traceable thereto.

108.    If any of the above-described forfeitable property, as a result of any act or

omission of the defendants:

    (a)    cannot be located upon the exercise of due diligence;

    (b)    has been transferred or sold to, or deposited with, a third party;

    (c)    has been placed beyond the jurisdiction of the court;

    (d)    has been substantially diminished in value; or

    (e)    has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as

incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other

property of the defendants up to the value of the forfeitable property described in this forfeiture

allegation.

    (Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United

States Code, Section 853(p))

A TRUE BILL



FOREPERSON

BREON PEACE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

F.#: 2021R00667
FORM DBD-34
JUN. 85

No.

## UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

*vs.*

QUANZHONG AN, GUANGYANG AN, ALSO KNOWN AS
"ANGELA AN," TIAN PENG, CHENGHUA CHEN, CHUNDE MING,
XUEXIN HOU AND WEIDONG YUAN,

Defendants.

## INDICTMENT

(T. 18, U.S.C., §§ 371, 951(a), 981(a)(1)(C), 982(a)(1), 982(b)(1),
1952(a)(3)(A), 1952(b)(i)(2), 1956(h), 2 and 3551 et seq.; T. 21, U.S.C., §
853(p); T. 28, U.S.C., § 2461(c))

*A true bill*

_ _ ▬▬▬▬▬▬▬▬▬ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                          *Foreperson*

*Filed in open court this* _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ *day,*

*of* _ _ _ _ _ _ _ _ _ _ _ _ *A.D. 20* _ _ _ _ _

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                                              *Clerk*

*Bail, $* _ _ _ _ _ _ _ _ _ _ _

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

*Alexander A. Solomon and Sara K. Winik, Assistant U.S. Attorneys*
*(718) 254-7000*