

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DMP:AAS/ANR

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 20, 2022

By ECF

The Honorable Ramon E. Reyes, Jr.
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Quanzhong An, et al.
     Criminal Docket No. 22-460 (KAM)

Dear Judge Reyes:

  The defendants Quanzhong An and Guangyang An are scheduled to be arraigned today on the above-referenced indictment.[1] The government respectfully submits that the Court should enter a permanent order of detention because both defendants present a substantial risk of flight.

I. Background

  Early this morning, Quanzhong An and Guangyang An were arrested pursuant to an indictment charging them with various crimes in connection with their efforts to cause the coerced repatriation of a U.S. resident ("John Doe-1") to the People's Republic of China ("PRC") and their participation in a money laundering scheme.

  A. The Harassment Campaign

  As alleged in the indictment,[2] the defendants participated in an international campaign to threaten, harass, surveil, and intimidate John Doe-1, a resident of United States,

---

[1] The five other defendants charged in the Indictment, each of whom work for the PRC government and participated in the conspiracy to coerce a United States resident to return to the PRC, remain at large and are believed to be in the PRC.

[2] Detailed herein is a proffer of the relevant facts and a discussion of the applicable law pertaining to the pretrial detention of the defendant. See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings).

and his family to force John Doe-1 to return to the PRC. These efforts were part of an initiative by the PRC's Ministry of Public Security called "Operation Fox Hunt" to locate and repatriate alleged fugitives who flee to foreign countries, including the United States. The PRC government has acted to target these alleged fugitives and their families to compel cooperation with the PRC government and self-repatriation to the PRC. As part of this campaign, PRC government officials and their assets have threatened targets and their family members, including family members residing in the PRC, with harm, including incarceration, to coerce the targets' repatriation to the PRC. The PRC government has taken these law enforcement actions on U.S. soil in a unilateral manner without approval of or coordination with the U.S. government.

The codefendants who remain at large—Tian Peng, Chenghua Chen, Chunde Ming, Xuexin Hou, and Weidong Yuan—work for the PRC government. Peng, Chen, Ming, and Hou work or have worked for the Shandong, PRC office of the PRC's Central Commission for Discipline Inspection ("Provincial Commission"), while Yuan works for the Central District Taxation Bureau in Zaozhuang, PRC.

Quanzhong An, a businessman operating in Queens, New York, and the indirect owner of a hotel in Flushing, Queens, acted as the primary U.S.-based liaison for the Provincial Commission's targeting of John Doe-1 and his family members, including his son John Doe-2, both in the United States and in the PRC. As part of the scheme, various PRC-based conspirators forced a relative in the PRC ("John Doe-3") to travel from the PRC to the United States in September 2018 to meet with John Doe-2 and convey threats that were intended to coerce John Doe-1's return to the PRC. Yuan—John Doe-3's superior at the Provincial Tax Bureau—escorted John Doe-3 from the PRC to the United States, under the guise of a visit with a tour group. Quanzhong An and his daughter Guangyang An helped coordinate Yuan and John Doe-3's visit. Guangyang An brought Yuan and John Doe-3 to John Doe-2's residence to locate John Doe-2.

On September 11, 2018, John Doe-2 met with John Doe-3 at a restaurant in Queens. In the recorded meeting, John Doe-3 explained that he had been forced to travel to the United States by the Provincial Commission, which wanted to repatriate the 100 most wanted fugitives, a group that purportedly includes John Doe-1. According to John Doe-3, nobody from the Supervisory Committee of the Provincial Commission was willing to travel to the United States with John Doe-3, because they could "get into trouble by enforcing laws" in the United States and could be detained. As John Doe-3 explained, once Yuan and John Doe-3 arrived in the United States, Yuan contacted Guangyang An, who met them, provided them with a picture of and contact information for John Doe-2, and drove them to John Doe-2's residence.

Yuan then joined the table of John Doe-2 and John Doe-3, and indicated that he had been "tasked to relay the message" to John Doe-1 that the "leadership in China would like to encourage the elite overseas Chinese to return" and that the PRC government had already caused the repatriation of 80 of the 100 most wanted fugitives. Yuan explained that he had

made "a special trip here," as John Doe-1's issue needed to be resolved "sooner or later," and John Doe-1 needed to return to the PRC.

Following the meeting, Yuan and John Doe-3 flew to Los Angeles, California, where they rejoined the tour group. Guanyang An arranged for and paid for this travel.

PRC-based defendants and coconspirators also engaged in a pattern of harassment targeting John Doe-1's family members residing in the PRC and the United States. In November 2017, Hou wrote John Doe-2 that John Doe-2 needed to understand how confident and determined our country is towards capturing [overseas fugitives]." Hou warned John Doe-2 that "coming back and turning yourself in is the only way out." Hou further threatened that "avoidance and wishful thinking will only result in severe legal punishments." In August 2019, Peng advised John Doe-1's former son-in-law that Peng had placed restrictions preventing the former son-in-law from leaving the PRC. The PRC government also harassed John Doe-1 and John Doe-2 through filing a lawsuit in New York State court, alleging that John Doe-1 had stolen funds from his former PRC-based employer and that John Doe-2 had knowledge of and benefitted from his father's scheme.

In a series of recorded meetings in 2020, 2021, and 2022, Quanzhong An repeatedly met with John Doe-2 and attempted to persuade John Doe-2 to cause the return of John Doe-1 to the PRC. In these meetings, Quanzhong An acknowledged that he is a member of the Standing Committee of the Chinese People's Political Consultative Conference (CPPCC), which enforces the rules and regulations of the Chinese Communist Party (CCP) abroad. Quanzhong An indicated that the CPPCC was trying to contact John Doe-1, and Quanzhong An had offered to help. At various times, he attributed his instructions to Chen, Ming, and Peng and acknowledged that the Fox Hunt operation was motivated by the PRC government's need to "save their faces" and repatriate as many fugitives as possible. Quanzhong An repeatedly conveyed the following offer from the PRC government: John Doe-1 would return to the PRC where he would be prosecuted without the prospect of detention and could return thereafter to the United States.

In the meetings, Quanzhong An admitted that the civil lawsuit filed against John Doe-1 and John Doe-2 would be withdrawn if John Doe-1 returned to the PRC. He stated that "they are still suing you to place additional pressure on you" and "will keep pestering you through a lawsuit" because the cost of it "really is a drop in the bucket for a country to spend $1 billion or $0.8 billion to meet the political task assigned by the Central Government." Quanzhong An further claimed that "it will be an endless misery" for John Doe-1 and John Doe-2 to defend themselves. On another occasion, Quanzhong An stated that the PRC government officials "don't really care if they can establish a case here, it's beyond that point, their intent is to make your life difficult with the political assignment they received…[T]here are plenty of people who just sit there [who work for the PRC government] with tea and come up with different stories as part of their job."

While meeting with John Doe-2, Quanzhong An admitted that he was acting as an agent of the Provincial Commission to increase his standing in the PRC. If he were

3

successful, the PRC government would "not see [Quanzhong An] as a bad guy."  At bottom, business interests prompted his involvement: "[A]s you know, there are many ways to make it work in China.  It's hard to do business in China."  Quanzhong An stated that "it will make [him] feel good if [he] can deliver the task successfully by making it happen" and "it makes [him] look good."  Indeed, "if the thing can be coordinated well, at least they will recognize me.  They would say Quanzhong An is a reliable person since I have resolved your dad's case.  They would not only recognize what I have done in the past but what I am capable of now from the way I handle this case."

During his meetings with John Doe-2, Quanzhong An repeatedly transmitted threats on behalf of the PRC government.  If John Doe-1 did not return, the PRC government would "keep pestering you, [and] make your daily life uncomfortable," in addition to actions to "target and monitor" John Doe-1's relatives in the PRC.  On another occasion, Quanzhong An stated that "they will definitely find new ways to bother you" and "it is definitely true that all of your relatives will be involved."  Later, he threatened, "They will try to make trouble.  Since you're here, they won't be able to come here, do anything to you.  They will do this…One, the people in China, they will . . . definitely have trouble."  Even if John Doe-1's relatives in the PRC did not exit their homes, "things can still happen."

In July 2022, Quanzhong An arranged for John Doe-2 to speak with Peng.  Peng stated that he had a "complete trust" in Quanzhong An.  Peng echoed the proposal set forth by Quanzhong An, and reiterated threats against John Doe-1 and John Doe-2 should John Doe-1 not return to the PRC.

More recently, Quanzhong An met with John Doe-2 again on September 29, 2022.  During this meeting, Quanzhong An pressed for John Doe-1 to execute an agreement to return to the PRC in advance of the CCP's 20th National Congress, which began on October 16, 2022.  As part of such agreement, Quanzhong An sought a written confession from John Doe-1, which would be submitted directly to the PRC government.  This morning, incident to Quanzhong An's arrest, agents located a photograph of what appears to be a sample confession for John Doe-1 to use.

B. The Money Laundering Scheme

As also alleged in the indictment, Quanzhong An and Guangyang An engaged in a money laundering scheme involving moving millions of dollars from the PRC to the U.S. financial system.  As part of the scheme, the defendants and their coconspirators repeatedly lied to U.S. financial institutions to obscure the ownership and control of the funds, including by using straw accountholders to send the funds, using pass-through accounts, making false statements on wire forms and in response to banks' inquiries as to the purpose of the transactions, and engaging in layering activities with the laundered funds.  Quanzhong An and Guangyang An controlled much of the laundered funds, using them to make personal tax payments, payments for their residences, credit card payments, and payments in connections with businesses they controlled.  As a result of the money laundering charge, the government

4

has charged forfeiture allegations against Quanzhong An's hotel in Flushing, New York, as well as the defendants' mansions in Roslyn, New York.

Notably, the investigation has revealed that Guanyang An has access to considerable wealth in the PRC. Agents have located text messages from the Bank of China to Guangyang An dating from October 2018 to March 2019 corresponding to at least 30 transactions involving Guangyang An's PRC-based accounts, which range from 50,000 RMB to hundreds of thousands of RMB. Accordingly, Guangyang An has control of PRC-based accounts in which she has conducted hundreds of thousands of dollars of transactions in a half-year period. Guangyang An does not appear to have disclosed her overseas bank accounts to the Internal Revenue Service.

C. The Charges

Quanzhong An is charged with (1) acting and conspiring to act as an agent of the government the PRC without prior notification to the Attorney General, in violation of 18 U.S.C. §§ 371 and 951; (3) violating the Travel Act, in violation of 18 U.S.C. §§ 1952(a)(3)(A) and 1952(a)(3)(b)(i)(2); (4) conspiracy to engage in interstate harassment, in violation of 18 U.S.C. §§ 371 and 2261A(1)(B); and (5) money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). Guangyang An is charged with (1) conspiracy to engage in interstate harassment, in violation of 18 U.S.C. §§ 371 and 2261A(1)(B); and (2) money laundering conspiracy, in violation of 18 U.S.C. § 1956(h).

II. Legal Standard

Under the Bail Reform Act, Title 18, United States Code, Section 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. See 18 U.S.C. § 3142(e) (a judicial officer "shall" order detention if "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community"). A finding of risk of flight must be supported by a preponderance of the evidence. See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987).

In addition, the Bail Reform Act lists the following factors to be considered in the detention analysis: (1) the nature and circumstances of the offenses charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. See 18 U.S.C. § 3142(g). As discussed below, these factors weigh heavily against pretrial release.

III. The Court Should Enter a Permanent Order of Detention

As set forth below, the factors to be considered in the detention analysis show that the defendants both present substantial risk of flight if released on bond.

5

A. The Nature and Circumstances of the Charged Crimes

The defendants' criminal conduct was extremely serious and broad in both temporal and geographic scope. Quanzhong An is charged with acting as an illegal agent of a foreign power who repeatedly traveled to the United States to carry out the PRC's illegal campaign to harass and intimidate an elderly victim. Guangyang An assisted her father in this scheme and personally participated in the harassment and surveillance of the victim, including by paying for the plane tickets of Yuan and John Doe-3 and transporting Yuan and John Doe-3 to John Doe-2's home on Long Island. The U.S. government—and the residents of this country—have a heightened interest in ensuring that persons on U.S. soil do not engage in unilateral law enforcement activities targeting U.S. residents on behalf of a foreign hostile state. The defendants' participation in the Operation Fox Hunt operation is therefore extremely serious.

The money laundering charge is no less serious and involved multifaceted efforts to frustrate and impede the Anti-Money Laundering ("AML") compliance programs of U.S. financial institutions by obscuring the ownership and control of funds transported from the PRC to the United States. The misrepresentations included using more than 50 straw accountholders to send funds from the PRC, making false statements as to the purposes of the transactions in the wire transfer messages, making false statements to U.S. financial institutions' compliance functions scrutinizing the overseas transfers, using pass-through accounts, and engaging in layering transactions. The defendants engaged in this fraudulent activity—which allowed them use millions of laundered funds—so that they could continue to enjoy access to their wealth through their U.S.-based bank accounts.

B. The Weight of the Evidence

The weight of the evidence against the defendants is overwhelming and includes, among other things, recordings of Quanzhong An's meetings with John Doe-2 in which he repeatedly pressured John Doe-2 to cause John Doe-1's repatriation to the PRC, boasted about his own standing with the PRC government, identified the PRC officials from whom he received his direction, and threatened John Doe-1 and his family with grave repercussions should he not return to the PRC. The evidence of Guangyang An's involvement in the scheme includes surveillance video showing her escorting Yuan and John Doe-3 to John Doe-2's residence, records of her payments for Yuan and John Doe-3's flights, and a letter she and Yuan left for John Doe-2 instructing John Doe-2 to call her or Yuan.

The evidence supporting the money laundering charge is similarly overwhelming and includes relevant bank records and electronic chats in which Guangyang An and a person in the PRC coordinated the use of at least two straw accountholders to send $100,000 to Guangyang An.

As courts have observed, "[w]hen the evidence of a defendant's guilt is strong, and when the sentence of imprisonment upon conviction is likely to be strong . . . a defendant has stronger motives to flee." United States v. Bruno, 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015). Here, although there is no guideline under the United States Sentencing Guidelines

6

applicable to Section 951 charges, the range of sentences that have been ordered in similar cases indicates that the defendants face a realistic prospect of a multi-year sentence. See United States v. Angwang, No. 20-CR-442 (EK), 2020 WL 5947187, at *2 (E.D.N.Y. Oct. 7, 2020) (reviewing sentences in Section 951 cases and noting that they "are all of meaningful duration"). On the money laundering scheme alone, the government conservatively estimates that the defendants face a Guidelines sentencing range of at least 97 to 121 months' imprisonment. See U.S.S.G. § 2S1.1.

Accordingly, the overwhelming nature of the evidence against the defendants favor their detention because they have a strong motive and incentive to flee.

C. The Defendants' History and Characteristics

Quanzhong An and Guangyang An are both PRC nationals who maintain substantial personal, professional, political, and business ties to the PRC, which underscores their risk of flight, access to assets that could facilitate such flight, and the likely support they would receive from the PRC government.

Both defendants were born and raised in the PRC and continue to travel to the PRC regularly. Quanzhong An divides his time between New York and the PRC, where he owns a home. He regularly travels to the PRC, typically staying abroad for six months or longer before returning to the United States. Mostly recently, in approximately August 2021, Quanzhong An traveled to the PRC and did not return to the United States until approximately July 2022. Prior to the pandemic, between 2014 and 2019, Guangyang An traveled to the PRC once a year, typically staying several weeks during each trip. Notably, according to his own recorded statements, Quanzhong An used his frequent travel to the PRC to meet with high-ranking PRC officials, including multiple codefendants in this case, to coordinate the scheme to coerce John Doe-1's involuntary return to the PRC.

Further underscoring the defendants' risk of flight is substantial evidence suggesting that their status in the United States was obtained through fraudulent means. As an initial matter, Quanzhong An has had multiple spouses and has appeared to maintain overlapping relationships with some of these spouses. For example, Quanzhong An has engaged in money laundering activities with one of his ex-wives, who is referred to in the indictment as the "Ex-Wife."

Moreover, records from U.S. Citizenship and Immigration Services ("USCIS") reveal that Quanzhong An married a spouse ("Spouse-1") in or about May 1992, and that they had a child together in or about 1994 ("Child-1"). Quanzhong An and Spouse-1 divorced in or about 2000. Quanzhong An then married a U.S. citizen ("Spouse-2") in or about 2000 or 2001. On March 16, 2001, Spouse-2 filed petitions for Quanzhong An and Guangyang An to become legal permanent residents; the application for Guangyang An was based on her purported status as Spouse-2's step-child. In December 2002 and February 2003, Quanzhong An and Guangyang An became legal permanent residents through Quanzhong An's marriage to Spouse-2. In approximately 2003, Guangyang An became a United States citizen. However, on February 28, 2003, Quanzhong An had a child with Spouse-1—even though they

7

had been divorced for three years and he was then married to Spouse-2.  Notably, USCIS records do not reveal any record of a divorce between Quanzhong An and Spouse-2.  In sum, it appears that Quanzhong An's marriage to Spouse-2 may have been a sham.

As alleged in the indictment, both defendants have access to untold stores of wealth in the PRC and in the United States, as well as access to various coconspirators' accounts in the United States, that they could use to secure their flight.  A monetary bond is inappropriate in this case because any such bond would likely constitute the proceeds of the defendant's illegal money laundering scheme.

As further alleged in the indictment, Quanzhong An also enjoys high-level contacts with the PRC government; Peng indicated to John Doe-2 that the PRC government has "complete trust" in Quanzhong An.  Accordingly, there is a substantial risk that the defendants would flee the United States and return to the PRC, which does not have an extradition treaty with the United States, or that they would seek refuge at the New York-based PRC Consulate or PRC Mission to the United Nations, which are inviolable spaces under applicable international law.  See United States v. Angwang, No. 20-CR-442 (EK), 2020 WL 5947187 (E.D.N.Y. Oct. 7, 2020) (ordering initial detention of defendant charged with acting as agent of PRC government and other crimes due to flight risk).

IV. Conclusion

The seriousness of the defendants' criminal conduct, the strong proof of the transnational repression and money laundering schemes detailed in the indictment, and the defendants' substantial ties to the PRC which does not have extradition treaty with the United States establishes, by a preponderance of the evidence, that the defendants represent extreme risks of flight.  The government respectfully submits that no condition or combination of conditions will assure the defendants' return to court, or their compliance with the Court's directives, and therefore the Court should enter a permanent order of detention pending trial.

Respectfully submitted,

BREON PEACE
United States Attorney

By:    /s/ Alexander A. Solomon
       Alexander A. Solomon
       Antoinette Rangel
       Assistant U.S. Attorneys
       (718) 254-7000

cc:    Clerk of Court (RER) (by ECF)
       Defense Counsel (by email)