

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AFM:AAS/MAA/ANR                          *271 Cadman Plaza East*
                                         *Brooklyn, New York 11201*

February 24, 2025

<u>By ECF and E-mail</u>

The Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Quanzhong An
            <u>Criminal Docket No. 22-460 (S-1) (KAM)</u>

Dear Judge Matsumoto:

        The government respectfully submits this letter in advance of defendant Quanzhong An's sentencing, which is scheduled for March 17, 2025, and in response to the defendant's sentencing memorandum, which was filed on February 10, 2025 (ECF No. 212). On May 28, 2024, the defendant pleaded guilty to Count Two of a superseding indictment (the "Superseding Indictment") (ECF No. 173), which charged him with acting as an agent of the government of the People's Republic of China (the "PRC" or "China") without prior notification to the Attorney General, in violation of 18 U.S.C. § 951, based on his role in an illegal scheme to coerce a PRC national ("John Doe-1"[1]) to repatriate to the PRC. For the reasons below, the government respectfully submits that a sentence of 60 months' imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case, given the defendant's central and critical role, over a period of five years, in the campaign to coerce John Doe-1 to repatriate to the PRC. Such a sentence would constitute just punishment, reflect the severity of the defendant's conduct, promote respect for the law, and provide the specific and general deterrent effect called for by the defendant's offense.

---

[1]      The pseudonyms used herein are consistent with those in the United States Probation Department's ("Probation") Presentence Investigation Report ("PSR"), dated December 10, 2024.

I.    Factual Background[2]

As part of a transnational repression[3] scheme known as "Operation Fox Hunt," the defendant participated in an international campaign to threaten, harass, and intimidate John Doe-1 and his son ("John Doe-2"), as well as their family members, with the goal of coercing John Doe-1 to repatriate to the PRC. As the defendant knew, his participation in this illegal scheme was directed by the PRC government and its officials. The defendant was a leader of this scheme, facilitating prolonged efforts – which ultimately succeeded – to locate John Doe-1 and harass him and his family members.

A.    The Operation Fox Hunt Scheme

Operation Fox Hunt was an operation designed to repatriate individuals who had moved overseas who the Chinese government alleged have committed criminal offenses. (PSR ¶ 13.) To advance these efforts, the PRC government targeted the alleged fugitives and their families to compel cooperation with the PRC government and self-repatriation to the PRC. (Id.)

Beginning in 2002, the PRC government targeted John Doe-1 for repatriation as part of Operation Fox Hunt, purportedly to face charges for crimes he had allegedly committed in the PRC. John Doe-2, as well as other family members, were pursued by the PRC government to coerce John Doe-1 into returning to the PRC. Specifically, beginning in 2017, the defendant and his co-conspirators acted for and with PRC government officials in the United States to harass and intimidate John Doe-1 into repatriating to the PRC. (Id. ¶ 17.) In 2020 and again in 2022, the defendant traveled to the PRC and received directives regarding John Doe-1's repatriation from the Shandong Provincial Office of the Central Commission for Discipline Inspection (the "Provincial Commission"), which is the highest internal control institution of the Chinese Communist Party (the "CCP") tasked with enforcing internal rules and regulations. Upon return to the United States, the defendant communicated harassing messages from the Provincial Commission to the family of John Doe-1. (Id. ¶ 19.)

---

[2]    Unless otherwise noted, the information below is from the PSR or the Superseding Indictment.

[3]    The National Security Division of the U.S. Department of Justice has explained that transnational repression "refers to a range of tactics that foreign governments employ to reach beyond their borders to harm, intimidate, threaten, harass, or coerce individuals." *See* National Security Division, U.S. Dep't of Justice, "Transnational Repression (TNR)," https://www.justice.gov/nsd/transnational-repression-tnr (last visited Feb. 10, 2025). As the National Security Division has underscored, "Transnational repression represents a threat not only to those who seek to exercise their basic rights and freedoms in the United States and abroad, but also to United States' sovereignty and democracy."

The defendant's co-conspirators in the Operation Fox Hunt scheme included his daughter Guangyang An, as well as PRC government officials who worked for entities responsible for Fox Hunt operations, such as the Ministry of Public Security (the "MPS"), which is a rough equivalent to the Federal Bureau of Investigation in the United States, and the Provincial Commission. (*Id.* ¶¶ 6-10.)  For example, co-defendant Tian Peng – whose conduct as part of the illegal repatriation scheme is described below – was employed by the Provincial Commission. (*Id.* ¶ 7.)

### i.  John Doe-3's Coerced Visit to the United States

In 2017, various co-defendants and other co-conspirators compelled John Doe-1's adult nephew ("John Doe-3"), a PRC official, to travel from the PRC to the United States to meet with John Doe-1's son, John Doe-2.  During the visit, which occurred in September 2018, John Doe-3 conveyed threats from the PRC government to John Doe-2 that were intended to compel John Doe-1's return to the PRC. (*Id.* ¶ 20.)

Specifically, on October 24, 2017, the defendant visited John Doe-2's residence in Long Island, New York, and asked to speak with John Doe-1, who was not home at the time. (*Id.* ¶ 23.)  The defendant sought John Doe-1 because the defendant wanted to facilitate a meeting between John Doe-1 and John Doe-3. (*Id.*)

Subsequently, on September 8, 2018, Guangyang An, her husband (the "Son-in-Law"), John Doe-3, and co-defendant Weidong Yuan (John Doe-3's deputy chief at the Provincial Tax Bureau), traveled to John Doe-2's residence.  They did not locate John Doe-1 or John Doe-2 at the residence, and left after several minutes. (*Id.* ¶ 26.)  The next day, Guangyang An drove Yuan and John Doe-3 back to John Doe-2's residence.  Home surveillance video footage captured Yuan and Guangyang An looking inside the windows of the residence, attempting to open the front and back doors of the residence, taking photographs of the residence, and looking through the mail. (*Id.* ¶ 27.)  In denying Guangyang An's suppression motion, this Court observed that the video footage depicted "Ms. An's unusually intrusive behavior during the visit." (ECF No. 171 at 50.)  Yuan then left a letter inside the residence mailbox, signed by John Doe-3, instructing John Doe-2 to contact either Yuan or Guangyang An, and providing both of their telephone numbers. (PSR ¶ 27.)  Soon thereafter, Guangyang An called John Doe-2's telephone number five times. (*Id.*)

On September 11, 2018, John Doe-2 met with John Doe-3 at a restaurant.  John Doe-3 told John Doe-2 that the PRC government had sent him and Yuan to the United States to locate John Doe-1 and John Doe-2, and that he had "no choice" in doing so. (*Id.* ¶ 28.)  Yuan subsequently joined John Doe-2 and John Doe-3.  Yuan told John Doe-2 that he had been "tasked to relay the message" to John Doe-1 that the "leadership in China would like to encourage the elite overseas Chinese to return" and that the PRC government had already caused the repatriation of 80 of the 100 most wanted fugitives. (*Id.* ¶ 32.)  Yuan explained that he had made "a special trip here" because John Doe-1 needed to return to the PRC. (*Id.*)  Yuan warned that, because John Doe-2 lived in the United States, John Doe-2 might not feel the

3

impact of John Doe-1's return to the PRC, but that "it will make a difference for the family members you still have" in the PRC. (*Id.*)

On September 11, 2018, Guangyang An purchased airplane tickets for Yuan and John Doe-3 to leave New York and drove them to the airport, following which they left. (*Id.* ¶ 33.)

### ii. The Message Provided to John Doe-5 for John Doe-1

On August 29, 2019, John Doe-1's former son-in-law ("John Doe-5") e-mailed John Doe-1's daughter ("Jane Doe-1"), who was John Doe-5's former wife, and stated that PRC official Peng stopped John Doe-5 at a train station in the PRC and asked John Doe-5 to pass a message to John Doe-1. (*Id.* ¶¶ 34-35.) John Doe-5 did so, providing a written message from Peng for John Doe-1, which included the following:

- The PRC government is "very serious about hunting down those who have fled abroad and recovering ill-gotten gains. They are determined to resolve the issue of returning those fugitives home. Regardless of the price, they undoubtedly will think of all possible ways and mobilize all their powers to accomplish this goal. So far, 60 some people out of the country's 100 fugitives on the Red Notice list have returned to the country."

- The PRC "now has a clear picture of the health, work, life and other situations of [John Doe-1] and his family. Please refer to the situations of other returned fugitives. Use your good judgment and decide carefully."

- "Right now under the call of the Central Committee of the Communist Party and the government, patriots in foreign lands also actively support and participate in this task. [The defendant] An Quanzhong is a patriotic businessman in the U.S. and the head of the Chinese Business Association of New York. . . . [He] has given strong support to the government's work. He is willing to communicate with [John Doe-1] and pay for [John Doe-1] to help the government recover the loss without anything in return. At the same time, he is willing to provide enough funds to guarantee [John Doe-1's] return and cover his expenses needed to return home. The government fully acknowledges his approach. Please thoroughly consider this offer and reach out to him."

- "The 10th Review and Investigation Office of Shandong's Commission for Discipline Inspection is in charge of this case. They have gotten support from [the defendant] An Quanzhong, the patriotic businessman. Mr. An can be contacted for specific matters . . . you can also reach out directly or indirectly to Tian Peng, the Deputy Director of the 10th

Review and Investigation Office, Commission for Discipline Inspection."

(ECF No. 173 ¶ 37; *see also* PSR ¶ 36.)

### iii. The Harassing Lawsuit Against John Doe-1 and John Doe-2

On December 19, 2019, a PRC state-owned corporation that previously employed John Doe-1 initiated a civil lawsuit against John Doe-1 and John Doe-2 in New York state court. The lawsuit alleged that John Doe-1 stole funds from the corporation and that John Doe-2 had knowledge of his father's scheme and benefited from it. As described below, in multiple recorded meetings, the defendant acknowledged that this lawsuit lacked merit and was filed at the behest of the PRC government solely to harass John Doe-1. (PSR ¶ 39.)

### iv. The Defendant's Meetings with John Doe-2

On January 23, 2020, approximately two months after returning to the United States from the PRC, the defendant met with John Doe-2. (*Id.* ¶ 40.) During the meeting, which was recorded, the defendant stated that he was a member of the Standing Committee of the Chinese People's Political Consultative Conference ("CPPCC"), which enforces rules and regulations of CCP abroad. The defendant stated that the CPPCC was trying to contact John Doe-1 and that he had offered to help. The defendant also admitted that, in 2017, he traveled to John Doe-2's home at the direction of the PRC government to locate John Doe-1 and John Doe-2. In addition, the defendant offered to pay the money that John Doe-1 purportedly owed to the PRC government to help settle the matter, claiming that, according to PRC officials, if John Doe-1 paid the money and returned to the PRC, John Doe-1 would not be detained and the civil lawsuit would be withdrawn. (*Id.* ¶¶ 40-41.) When asked why the defendant was willing to pay the fine on John Doe-1's behalf, the defendant responded that the PRC government "will be very happy if this thing is settle[d]." (*Id.* ¶ 42.) The defendant explained that the PRC officials needed to "save their faces" by proving their ability to repatriate wanted fugitives and that their inability to do so would mean they would lose their jobs. (ECF No. 173 ¶ 46.) The defendant also warned – while claiming he did not want to pronounce "ruthless words" – that PRC officials would "keep pestering" John Doe-2 and "make [his] daily life uncomfortable" if John Doe-2 was unable to persuade his father to return to the PRC, and further warned that the PRC government had "targeted and monitored" John Doe-1's relatives in the PRC. (*Id.* ¶ 47.)

More than a year later, on July 1, 2021, one month after returning to the United States from the PRC, the defendant again met with John Doe-2. During the meeting, which was recorded, the defendant admitted that the civil lawsuit was frivolous and paid for by the PRC government to coerce John Doe-1's return to the PRC. The defendant acknowledged that "they are still suing you to place additional pressure on you" and "will keep pestering you through a lawsuit" because the cost of it "really is a drop in the bucket for a country to spend $1 billion or $0.8 billion to meet the political task assigned by the Central Government." (*Id.* ¶¶ 49-50; *see also* PSR ¶ 44.) The defendant further stated that "it will be an endless misery" for John Doe-1 and John Doe-2 to defend themselves. (ECF No. 173 ¶ 50.) In response, John

5

Doe-2 asked if the PRC government would use other means to pressure him. The defendant replied that "they will definitely find new ways to bother you" and "it is definitely true that all of your relatives will be involved." (*Id.*) The defendant subsequently warned that, if John Doe-1 refused to return, the PRC government will "spend whatever it takes no matter [if] it's going to be 1 or 10 million dollars to pursue it." (*Id.* ¶ 52.) In addition, the defendant repeated his offer to pay John Doe-1's fine and promised that, if John Doe-1 returned to the PRC, John Doe-1 would not be detained. (*Id.* ¶ 51.) The defendant also acknowledged that his business interests prompted his involvement in John Doe-1's case, stating "[A]s you know, there are many ways to make it work in China. It's hard to do business in China." (*Id.*)

A few weeks later, on July 20, 2021, the defendant again met with John Doe-2, and conveyed similar information as during the July 1 meeting, including that, if John Doe-1 returned to the PRC, he would not be detained and the civil lawsuit would be dismissed, and that the purpose of the lawsuit was "to make [John Doe-2's] life difficult." (*Id.* ¶¶ 53, 56.) During the meeting, which was recorded, the defendant and John Doe-2 discussed John Doe-3's travel to the United States to "deliver[] the same message as the one [the defendant] shared" about repatriating to the United States, confirming that the defendant was aware of the scheme to pressure John Doe-3 into traveling from the PRC to the United States to try to coerce John Doe-1's repatriation. (*Id.* ¶ 54.) The defendant also boasted that the PRC government selected him "to be the one to make [the repatriation] happen," and that it would "make[] [him] look good" to the PRC government if succeeded." (*Id.* ¶ 57.)

Almost a year later, on July 12, 2022, after returning to the United States from the PRC the previous month, the defendant again met with John Doe-2 and conveyed similar information as during the July 2021 meetings. In the recorded meeting, the defendant warned that, if John Doe-1 did not return to the PRC, the PRC government would "find some things on you, non-stop keep looking for things" and would "make trouble" for John Doe-1's family members in the PRC. (*Id.* ¶ 62; *see also* PSR ¶ 47.)

Approximately one week later, on July 21, 2022, the defendant met with John Doe-2 at the defendant's hotel, for the purpose of facilitating a phone call between John Doe-2 and the PRC government official working on John Doe-1's case. (PSR ¶ 48.) The defendant called PRC official Peng on speakerphone in a recorded conversation. During the call, Peng confirmed his identity and position with the PRC government. Peng stated that the defendant, whom Peng characterized as a "patriotic businessman," had been involved in John Doe-1's case for many years and had provided information obtained from John Doe-2 to the PRC authorities, and that Peng had "complete trust in [the defendant]." Peng conveyed to John Doe-2 information like that previously conveyed by the defendant. (ECF No. 173 ¶ 65; *see also* PSR ¶ 48.)

B. The Financial Fraud and Money Laundering Scheme

The defendant and co-defendant Guangyang An also spearheaded a scheme to move millions of dollars from the PRC to the United States. As these activities violated applicable PRC law regarding capital flight, which imposed a limit of $50,000 per person

annually for a total foreign exchange settlement, the co-conspirators engaged in deceptive tactics designed to frustrate and impede the Anti-Money Laundering ("AML") controls of four U.S. financial institutions (the "Financial Institutions"), so that the co-conspirators could enjoy continued access to funds under the control of the Financial Institutions.  (PSR ¶¶ 52-53.)

The co-conspirators used international wire payments passing from the PRC to the United States via the real time gross settlement fund transfer system operated by the U.S. Federal Reserve Bank called Fedwire.  The communications underlying the actual payments were referred to as "Originator to Beneficiary Information" or "OBI."  The Financial Institutions processing international transactions regularly screened OBI messages of wire payments to avoid executing transactions in violation of applicable law.  (Id. ¶ 53.)

The co-conspirators took various measures to obscure the ownership and control of the funds, including by (1) using more than 50 third parties to initiate transactions from the PRC to the United States of $40,000 to $50,000; (2) receiving funds from the PRC in various domestic personal accounts associated with the defendants or their relatives, including the Son-In-Law, an individual whom Guangyang An identified to the Financial Institutions as her sister (the "Associate"), the sister's husband (the "Husband"), and one of the defendant's ex-wives (the "Ex-Wife"); (3) falsely stating the purposes of the transactions in OBI messages; (4) engaging in layering transactions in various domestic personal and corporate accounts controlled by the co-conspirators, once funds arrived in the United States; and (5) making materially false statements when asked by the Financial Institutions about the purposes of the transactions, claiming, for example, that the purposes of the transactions were for tuition, loan repayments, or travel expenses.  (Id.)  Funds transferred from the PRC were frequently used by the defendant and Guangyang An for their personal or business purposes, including to pay personal credit card debt, mortgages on their residences in Roslyn, New York, mortgages on the defendant's hotel, and their tax liabilities.  (Id. ¶ 55.)

Among the transactions and underlying communications that demonstrate the defendant's central role in the money laundering scheme, including an intent to deceive the Financial Institutions, are the following:

- On October 12, 2016, Quanzhong An's PRC-based company An Qiao Group Co Ltd. wired $2 million to its U.S. affiliate An Qiao Group NY LLC.  On the same date, the defendant wrote a $2 million check from An Qiao Group NY to one of her personal accounts, from which she wrote another $2 million check to Quanzhong An.  Also on the same date, Quanzhong An wrote a check in the amount of $2,000,006 to his company Ann Profit Group LLC.  (Ex. A.[4])

---

[4]    The government respectfully requests leave to file under seal the exhibits to this motion, which include sensitive personal information, such as financial information.  See, e.g., United States v. Amodeo, 71 F.3d 1044, 1050-52 (2d Cir. 1995) (recognizing reasons justifying sealing include preserving the privacy interests of innocent third parties).

- On April 14, 2017, Guangyang An told the defendant that one of her shell companies (which they used to receive funds from the PRC) had received $700,000.[5] (Ex. B (AN0018671).) The defendant then sent an image which indicated that $484,520 had been wired to Guangyang An.

- From May 4, 2017 to May 24, 2017, the defendant and Guangyang An discussed several wire transfers ranging from $400,000 to $800,000.[6] (Exhibit B (AN0018672); Ex. C.)

- On April 12, 2018, Guangyang An wrote to the defendant that they could only use accounts that a specified Financial Institution did not know about, rather than accounts known to the Financial Institution. (Ex. D (AN0018787).) Guangyang An and the defendant also discussed opening additional accounts at a specified Financial Institution to receive funds in excess of the capital flight limits. After the defendant proposed sending Guangyang An $1 million, she responded that she would open an account. (*Id.*)

- On December 30, 2020, the defendant informed Guangyang An that he would send her $1 million, to which she said she would think of a way to get the money over to the United States. The defendant then instructed Guangyang An to delete their chat messages regarding the transfers and to avoid using a specific chat platform. (*Id.* (AN0018809).)

To the extent the defendant argues at sentencing, as does co-defendant Guangyang An in her sentencing submission (ECF No. 218 at 26), that fraud involving a specific Financial Institution was not criminal because one or more of the employees at that Financial Institution appear to have acted unscrupulously in continuing to service the defendant and Guangyang An's accounts while fully aware of the illegitimate purpose of their international transfers, such argument should be rejected because the employee or employees did not share their understanding with the Financial Institution's AML leadership. Indeed, on September 15, 2018, Guangyang An and a bank employee (the "Employee") engaged in a chat communication concerning a proposed wire transfer of "$200w" (approximately $2 million) from Guangyang An's purported friend in Hong Kong. (Ex. E (AN0018725).) Guangyang An wanted to know whether the Employee's side (a reference to the bank) could accept the wire transfer and, if so, what restrictions applied. The Employee asked whether there would be a company name associated with the wire transfer. The Employee pointed to a case of a

---

[5]    The chat conversations described in this section are based upon detailed summary translations, rather than verbatim transcripts.

[6]    The defendant and his daughter consistently used a shorthand to refer to the total amounts for transactions (*e.g.*, "40" for a $400,000 bank transaction), which is corroborated by bank records.

wire associated with an unspecified "money exchange company" that resulted in applicable restrictions, absent fulsome information regarding the remitter. (*Id.*)  Subsequently, on September 26 and 27, 2018, the defendant's account received wire transfers totaling $4.5 million from an individual in Hong Kong (the "Individual").  When an AML examiner asked the Employee for information about the $4.5 million transfers, the Employee indicated that the funds represented "[m]oney that Mr. An len[t] to his friend [the Individual] returning from [the Individual]," and acknowledged that the Employee had sought the wires "because we asked customer [Guangyang An] [to] bring in more deposit to achieve our deposit goal and CD promotion goal." (Ex. F. (AN0019024).)  Notably, the investigation has not uncovered any bank transaction suggesting that the Individual had previously borrowed $4.5 from the defendant.

## II.    Applicable Law

The Supreme Court has explained that the sentencing court "should begin all sentencing proceedings by correctly calculating the applicable [Guidelines] range.  *Gall v. United States*, 552 U.S. 38, 49 (2007).  The Supreme Court further has explained that "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  *Id.*  The sentencing court "should then consider all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested by a party."  *Id.* at 49-50.  In doing so, the court "may not presume that the Guidelines range is reasonable," but "must make an individualized assessment based on the facts presented."  *Id.* at 50 (internal citation omitted).

Title 18, United States Code, Section 3553(a) provides, in part, that in imposing a sentence, the court shall consider:

(1)  the nature and circumstances of the offense and the history and characteristics of the defendant; [and]

(2)  the need for the sentence imposed--

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; [and]

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a).  "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable,

recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." *United States v. Alexander*, 860 F.2d 508, 512-13 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

III.     Guidelines Calculation

As described below, the parties and Probation agree that the provisions of 18 U.S.C. § 3553 control the imposition of the appropriate sentence in this case because no Guideline has been promulgated for 18 U.S.C. § 951 and there is no sufficiently analogous Guideline. (ECF No. 212 at 23; PSR ¶¶ 60, 68.)

IV.     Argument

For the reasons below, the government respectfully submits that a sentence of 60 months' imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case. Specifically, such a sentence would constitute just punishment, reflect the severity of the defendant's offense, promote respect for the law, and provide the specific and general deterrent effect called for by the defendant's offense. In contrast, the defendant's requested sentence of time served (approximately seven months' imprisonment) would not further the objectives of sentencing in this case.

A. There Is No Analogous Guideline and Accordingly the Provisions of Section 3553 Control

The parties and Probation agree that there is no analogous Guideline for Section 951 offenses, and accordingly that the factors under 18 U.S.C. § 3553(a) control. (ECF No. 212 at 23; PSR ¶¶ 60, 68.) For the Court's convenience, the government nevertheless details the legal basis for relying upon the Section 3553(a) factors.

As background, the appropriate offense level under the Guidelines is typically determined by reference to the statutory index contained in Appendix A to the Guidelines. *See* U.S.S.G. § 1B1.2(a). For statutory violations that are not listed in the appendix, the Guidelines instruct that the "most analogous offense guideline" is to be used. U.S.S.G. § 2X5.1. Where, however, there is no sufficiently analogous Guideline provision, the Court is to sentence the defendant anywhere within the statutory sentencing range based on application of the Section 3553(a) factors. *See* U.S.S.G. § 2X5.1 ("If there is not a sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553 shall control."). As relevant here, courts routinely have held that no sufficiently analogous Guideline provision applies to convictions for violating 18 U.S.C. § 951. *See, e.g.*, *United States v. Zhu*, No. 21-CR-265 (S-1) (E.D.N.Y.) (finding no sufficiently analogous Guideline provision where defendant was convicted of violating § 951 for engaging in Operation Fox Hunt activities on behalf of the PRC, and specifically finding

that stalking Guidelines were not sufficiently analogous because, unlike the stalking offense, the critical element of the § 951 offense is the defendant's knowing involvement with a foreign government to carry out that government's directives in the United States without providing the required notification) (Ex. G at 11:12-13:3); *United States v. Buryakov*, No. 15-CR-73 (S.D.N.Y.), ECF No. 158 at 6-7, 17 (finding no sufficiently analogous Guideline provision where defendant was convicted of violating § 951 for agreeing to provide information to Russian official); *United States v. Chun*, No. 16-CR-618, ECF No. 17 at 10 (S.D.N.Y.) (parties jointly submitted there was no analogous Guideline and court agreed where defendant was convicted of violating § 951 for providing sensitive information to Chinese officials); *United States v. Butina*, No. 18-CR-218, ECF No. 120 at 11-12 (D.D.C.) (observing that "[t]he majority of the courts that have dealt with this issue have determined that § 951 does not have a sufficiently analogous guideline" and similarly finding no sufficiently analogous Guideline provision for conspiracy to violate § 951).

Here, too, no sufficiently analogous Guideline applies to the defendant's conviction for acting as an illegal agent of a foreign government, in violation of 18 U.S.C. § 951. Accordingly, the provisions of 18 U.S.C. § 3553(a) control. *See* U.S.S.G. § 2X5.1. Based on application of the Section 3553(a) factors without reference to any Guideline calculation, the Court may sentence the defendant anywhere within the statutory range of zero to the statutory maximum of 10 years' imprisonment.

## B. Analysis of the Sentencing Factors Under Section 3553(a)

Section 3553(a) requires courts to consider various factors in imposing a sentence, including the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to serve as a deterrent, and the need to avoid unwarranted sentencing disparities. For the reasons below, analysis of these factors supports imposing a sentence of 60 months' imprisonment.

### i. The Nature and Circumstances of the Offense and Related Conduct

#### a. The Operation Fox Hunt Scheme

The defendant's role in the scheme to forcibly repatriate John Doe-1 and terrorize him and his family warrants a sentence of 60 months' imprisonment. The defendant was a critical and longstanding member of the repatriation scheme, and his actions furthered the PRC government's illegal operations on U.S. soil – conduct which poses a serious threat to U.S. national security and sovereignty. Such conduct is extraordinarily serious and has impacted the lives of John Doe-1, John Doe-2, and their family members.

As described above, the defendant sought to elevate his status within the PRC government as a means of furthering his own economic interests. The defendant's involvement in John Doe-1's case began as early as October 2017, when he visited John Doe-2's residence in Long Island to find John Doe-1 – an uninvited visit captured on the home video surveillance system. (PSR ¶ 23.) In 2018, the defendant sent his daughter, Guangyang An, and two PRC government officials to John Doe-2's residence. And in subsequent

meetings with John Doe-2, the defendant served as a mouthpiece for the PRC by conveying threatening messages to John Doe-2 on its behalf. For example, in a January 2020 meeting with John Doe-2, the defendant said he did not want to pronounce "ruthless words," sent by the PRC government but indicated that PRC officials would "keep pestering [John Doe-2], [and] make [his] daily life uncomfortable" if John Doe-2 was unable to convince his father to repatriate to the PRC. (ECF No. 173 ¶ 47.) The defendant explained that the PRC officials needed to "save their faces" by proving their ability to repatriate wanted fugitives and that their inability to do so would mean they would lose their jobs. (*Id.* ¶ 46.) He repeated similar threats in meetings in 2021 and 2022. In sum, the defendant's harassment of John Doe-2 and his family continued unabated from 2017 until the defendant's arrest in 2022. The defendant's conduct was intended to aid a foreign government in terrorizing individuals living here in the United States – and did so, as John Doe-2's victim impact statement described below demonstrates.

The defendant's attempts to minimize his conduct by characterizing it as an effort to assist John Doe-1 and his family (ECF No. 212 at 2, 18, 21) are unavailing. Although the defendant argues that he tried to help John Doe-1 because the defendant "[knew] the pain that the Chinese government could inflict on John Doe-1 and his family" (*id.* at 2), such argument ignores the practical reality of the harms John Doe-1 would have faced had he returned to the PRC. The defendant was well aware of those harms, as reflected not only by his admission that he knew the pain the PRC government could inflict (which he claims was based on his own experiences growing up in the PRC), but also by the defendant's repeated statements to John Doe-2 that the PRC government could and would inflict such harm on John Doe-1 and his family. Despite that knowledge, the defendant – acting for his own economic and political advantage – nevertheless tried to coerce John Doe-1 to return to the PRC. The defendant's contention that he "wasn't threatening to [] make the [lives of John Doe-1 and his family] unbearable, rather he was indicating that the PRC government would do so" (*Id.* at 21) is similarly unpersuasive. The defendant repeatedly telling John Doe-2 of the pain PRC authorities would inflict was a tactic that the defendant employed to try to coerce John Doe-1's repatriation; it was not information that the defendant conveyed for John Doe-1's or John Doe-2's benefit. There is no meaningful distinction between the defendant personally threatening to harm John Doe-1 and his family, on the one hand, and the defendant communicating (and lending credibility to) the threats issued by the PRC government, on the other hand. The Court accordingly should reject the defendant's efforts to characterize his conduct as merely trying to help John Doe-1 and his family. (*Id.* at 18.)

Indeed, the victim impact statement from John Doe-2 makes clear that the defendant did not "help" John Doe-1 and his family, but rather caused them substantial and lasting harm. (*See* Ex. H (John Doe-2 Victim Impact Statement ("VIS")).) According to John Doe-2, he understood the demands conveyed by the defendant to John Doe-1 and John Doe-2 to be "serious threats and warnings," which left John Doe-2 and his family "in a state of distress for more than seven years" and "liv[ing] in fear of being kidnapped or killed." (VIS at 1-2.) John Doe-2 states that his "worry and fear for the safety of [his] father and whole family has been all-consuming," and describes that "[i]t is as if there is a dark cloud hanging over our heads and disaster could appear at any moment." (*Id.* at 2-3.) John Doe-2 also describes that,

as a result of the defendant's conduct, John Doe-1 suffered from depression, anxiety, fear, guilt, insomnia, and nightmares, and John Doe-2 suffered from anxiety, stress, depression, fear, exhaustion, insomnia, headaches, difficulty concentrating, and anger. (*Id.* at 2.) In addition, John Doe-2 highlights the significant disruption to his daily life, as well as to the lives of his family members. He describes the shift in his father, John Doe-1, from a social and outgoing person to someone who "didn't want to go out," even for such brief periods as to walk the dogs. (*Id.*) John Doe-2 further details the way in which his and his family members' lives have been upended, including that he and his family have been "hiding in fear" for several years," moved to a new house to avoid harassment by the defendant and his co-conspirators, severed ties with family and friends because of fears of endangering them, and suffered adverse business consequences. (*Id.* at 1-2.)

In *United States v. Zhu*, No. 21-CR-265 (S-1) (E.D.N.Y.), a case involving an Operation Fox Hunt scheme and similar physical and emotional trauma to victims, Judge Chen recently found:

> [W]orking for a foreign government as an unregistered agent and stalking are both extremely serious crimes. There cannot be any debate about that. By committing the Section 951 offense, the defendant helped a foreign Government, the People's Republic of China conduct a campaign of – and this is using the Government's words – transnational repression against two individuals living in the United States and seeking refuge here, quite frankly. And that campaign included terrorizing their family members here and in the PRC. . . . These types of crimes are a threat to this country's national security. There can be no debate about that, as well.

(Ex. G at 76:11-77:3.) So too here.

Finally, contrary to the defendant's contention (ECF No. 212 at 3, 25), the February 5, 2025 memorandum from the Attorney General has no bearing on this case, as it applies to general charging policy, not to charged cases.

### b.  The Financial Fraud and Money Laundering Scheme

Notably, the defendant's criminal activity is not limited to his involvement in the Operation Fox Hunt scheme. The defendant, Guangyang An, and their co-conspirators perpetrated a vast money laundering scheme to defraud financial institutions so that he and his family "could enjoy continued access to the U.S.-based bank accounts." (ECF No. 173 ¶ 82.) The scheme included, *inter alia*, using accounts of relatives and associates as pass-throughs for the defendants' use, using straw accounts to send wire transfers, and making false representations to financial institutions regarding the purpose and ownership of specific transactions, including in response to AML inquiries. (*Id.* ¶¶ 82, 84.) That constitutes relevant conduct demonstrating the defendant's lack of respect for the law, and is appropriately considered by this Court, notwithstanding that it is not the crime of conviction. *See* 18 U.S.C.

§ 3661. Indeed, Probation found that such conduct – which is not otherwise accounted for in the sentencing considerations in this case – may warrant an increased sentence.[7] (PSR ¶¶ 61, 121.) Moreover, based upon the documentary evidence submitted to the Court in support of this memorandum, the government has proven the defendant's participation in a conspiracy to commit financial fraud and money laundering by a preponderance of the evidence.[8]

Over a period of several years, the defendant and Guangyang An moved millions of dollars from the PRC into the United States. As described above, the two communicated about the need to use various individuals and companies to obfuscate the source of their funds and the ultimate end users. The defendant did so with a specific intent to deceive the Financial Institutions with inaccurate information about the source and purpose of the funds. In their conversations, the defendant and Guangyang An discussed the need to use multiple accounts that appeared unrelated to the co-defendants and to delete incriminating communications about engaging in such conduct. They used dozens of family members and friends to orchestrate transactions so that they could launder millions of dollars from the PRC to the United States. As their communications demonstrate, the defendant and Guangyang An ensured that their transactions were just under the $50,000 limit to avoid capital flight restrictions and spread transactions among various accounts so as not to raise suspicion. They also repeatedly made false statements to the Financial Institutions regarding the purposes of the illegal transactions. (ECF No. 173 ¶¶ 84-85.) For example, on January 12, 2021, a co-conspirator transferred approximately $50,000 to Guangyang An, with an OBI message indicating that the funds were for "Tuition." (*Id.* ¶ 85.) Such funds, however, were not used to make tuition payments.

The defendant, in a conclusory footnote, seemingly raises four objections to the Court's consideration of his role in the financial fraud and money laundering scheme for purposes of sentencing. (ECF No. 212 at 21-22 n.2.) These arguments each fail. *First*, the defendant contends that the funds at issue were the legal proceeds of the An family's real estate business in the PRC that were transferred to the U.S. accounts of An family members or to An family business accounts, and that such transfers are unrelated to the Section 951 charges. For purposes of sentencing, it is of no moment whether the defendant's financial fraud and money laundering scheme relates to the Section 951 offense conduct; it is relevant conduct regarding the defendant that the Court properly can and should consider. *Second*, the defendant argues

---

[7]    Probation concluded that, in light of the defendant's financial fraud and money laundering conduct, an upward departure under U.S.S.G. § 5K2.21 might be warranted. The government respectfully submits that, although such conduct warrants an increased sentence, given that there is no applicable Guidelines calculation, that should be considered as part of the Section 3553(a) factors rather than treated as an upward departure.

[8]    The government respectfully submits that, although there may be disputed issues of material fact regarding the defendant's participation in the financial fraud and money laundering scheme, such issues may be resolved based on the documentary record submitted to the Court and without a *Fatico* hearing with witness testimony.

there is no proof that the Ans intended to deprive the bank of anything of value. As this Court found in denying Guangyang An's motion to dismiss, the facts – which at the time were alleged, and now have been proven beyond a preponderance of the evidence based upon the documentary evidence submitted to the Court – "permit a reasonable inference" that the Ans knew their conduct likely would harm the banks' property interests, that is, funds under the control of the banks by depriving them of accurate information regarding such funds. (ECF No. 171 at 20.) Specifically, the defendants knew they were depriving the banks of deposited funds in accounts held by the banks by fraudulently inducing the banks to process international transfers and receive funds transferred from the PRC. (*Id.* at 22, 24.) *Third*, the defendant argues there is no allegation that the banks lost any money through the defendant's alleged financial fraud and money laundering. As this Court found in denying Guangyang An's motion to dismiss, "a scheme to defraud requires 'neither a showing of ultimate financial loss nor a showing of intent to cause financial loss.'" (*Id.* at 27 (citing *United States v. Shaw*, 580 U.S. 63, 67 (2016).) Further, the defendant was charged with bank fraud and money laundering conspiracy; there is no legal requirement that the scheme succeed for liability to attach.

### ii. The History and Characteristics of the Defendant

The defendant lacks any criminal history, and the government does not contest the assertions of those who have written letters concerning the defendant's personal history and family relationships.

The government respectfully submits, however, that the defendant's arguments with respect to his medical conditions do not warrant leniency in his sentence, especially when weighed against the other Section 3553(a) factors. The government sympathizes with the defendant's medical conditions, but they are not so extraordinary or otherwise of such an unusual nature that the Bureau of Prisons could not accommodate them. *Rita v. United States*, 551 U.S. 338, 360 (2007) (affirming the substantive reasonableness of sentence in part because defendant's health circumstances were not unusual and the sentencing court "explicitly [took] health into account by seeking assurance that the Bureau of Prisons [would] provide appropriate treatment"); *United States v. Koon*, 518 U.S. 81, 96 (1996) (advising that when considering sentence departure factors, "the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present."); *United States v. Crone*, 343 F. App'x 588, at *2 (2d Cir. 2009) (affirming substantive reasonableness of sentence imposed by district court despite defendant's serious cardiac condition because record supported that condition could be treated "as effectively in prison as out of prison"); *United States v. Martinez*, 207 F.3d 133, 139 (2d Cir. 2000) ("There is no evidence in the record that [the defendant's condition] is of a type that cannot be adequately cared for within the prison system."); *United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) ("Physical condition is not ordinarily relevant to determining whether the defendant should receive a departure from the applicable guideline range"); *see also United States v. Marsh*, No. 10-CR-0480, 2011 WL 5325410, at *59 (E.D.N.Y. Oct. 26, 2011) (imposing sentence of imprisonment for fraud scheme despite defendant's chronic condition for which he takes daily medication); *United States v. Kurland*, 718 F. Supp. 2d 316, 319

(S.D.N.Y. 2010) (declining to apply downward departure for defendant's health issues, which included hyperlipidemia, diabetes mellitus, and prostate cancer, noting that defendant was "not afflicted with an extraordinary physical impairment that the Bureau of Prisons would have difficulty accommodating"). The government notes that the defendant's complaints regarding his medical treatment relate to the treatment he received at the Metropolitan Detention Center (the "MDC") (ECF No. 212 at 4-6), but if sentenced to a custodial term, the defendant will not be incarcerated at the MDC, even temporarily. The defendant's medical conditions, including the need for monitoring, are not such extraordinary physical conditions as to warrant a non-custodial sentence.

### iii. The Need for the Sentence to Serve as a Deterrent

The seriousness of the defendant's conduct warrants a term of imprisonment that would deter others both from undermining national security interests by illegally acting on behalf of foreign governments on U.S. soil and from causing substantial harm to victims in the United States by harassing them and their families. Through its just punishment of the defendant in this case, the Court can send an appropriate message that such conduct is grave and those engaging in such activities will receive serious punishment.

The need for general deterrence is of paramount importance given the PRC government's well-established transnational repression activities in the United States – including activities in connection with Operation Fox Hunt – which undermine U.S. laws, norms, and individuals' rights. Indeed, in recent years, the PRC government repeatedly has engaged in Operation Fox Hunt activities here in this District. *See, e.g.*, *United States v. McMahon, et al.*, No. 21-CR-265 (S-1) (E.D.N.Y.) (PKC) (four defendants convicted of, *inter alia*, acting as illegal agents of PRC government and/or conspiring to act as illegal agents of PRC government, in connection with multi-year scheme in which PRC nationals living in United States and various family members, both in the United States and in the PRC, were threatened in order to coerce the nationals' repatriation); *United States v. Ying*, No. 22-MJ-1711 (S.D.N.Y.) (charging at-large PRC national with conspiring to and acting as illegal agent of PRC government in connection with multi-year scheme in which PRC nationals living in United States and various PRC-based family members were threatened in order to coerce the nationals' repatriation, including by detaining a pregnant PRC-based relative, and alleging various conduct undertaken in furtherance of the scheme in the Eastern District of New York). Notably, the U.S. Department of Homeland Security has warned that the PRC "likely will continue to pursue transnational repression activity" in the United States – including the PRC's "global 'Operation Fox Hunt.'" *See* Office of Intelligence and Analysis, U.S. Dep't of Homeland Security, "Homeland Threat Assessment: 2024," available at https://www.dhs.gov/sites/default/files/2023-09/23_0913_ia_23-333-ia_u_homeland-threat-assessment-2024_508C_V6_13Sep23.pdf at 7 (last visited Feb. 21, 2025). The pervasiveness and seriousness of the Operation Fox Hunt conduct in the United States, and here in the Eastern District of New York, underscores the need for general deterrence. *See, e.g.*, *United States v. Zhu*, No. 21-CR-265 (S-1) (E.D.N.Y.) (PKC) ("We've been getting more and more of these prosecutions just as the Government notes in its submission. So it is necessary for the sentence I impose on Mr. Zhu to send a clear message to anyone else, who would seek to work for the Chinese Government

for this purpose, and not register, that there will be serious consequences for doing so.") (Ex. G at 78:1-7.)[9]  A significant sentence of 60 months' imprisonment – unlike the sentence of time served that the defendant seeks based on the seven months the defendant spent at the MDC – would serve as a warning to other potential PRC operatives and assets.

      With respect to specific deterrence, although he has no previous criminal convictions, the defendant poses a recidivism risk.  The defendant has repeatedly, over many years, demonstrated his willingness to prioritize his economic interests above all else – in connection with both his willingness to harass John Doe-1 and his family as part of the Operation Fox Hunt scheme and his pervasive financial fraud and money laundering activities. Without a significant sentence of imprisonment, the defendant may make a calculated decision in the future that the benefit of favorable treatment by the PRC government outweighs the risks of being caught.

### iv.  The Need to Avoid Unwarranted Sentencing Disparities

      Courts have imposed significant sentences for Section 951 convictions where – as here – the defendant has engaged in a transnational repression scheme, such as Operation Fox Hunt, on behalf of a foreign government.  Insofar as the defendant acted out of economic considerations, enjoyed significant access to PRC government officials, acted in a harassment scheme directed by the PRC government over a period of five years, and was the central point of contact in the United States for all harassment activities, the defendant's conduct warrants a sentence of 60 months' imprisonment.

      Such a sentence would not result in unwarranted sentencing disparities.  For example, in *United States v. Alvarez*, No. 05-CR-20943 (S.D. Fla.), the court sentenced Alvarez, who pleaded guilty to conspiracy to act as an illegal foreign agent, to 60 months' imprisonment.  (ECF No. 236.)  Alvarez, an agent of Cuba's Directorate of Intelligence and its predecessor intelligence agencies, gathered information within the United States between the late 1980s and 1990s on matters of interest to the Cuban government, including informing on anti-Castro individuals and groups and other elements of the Cuban exile community in South Florida.  He then shared sensitive, non-public information about specific individuals. (ECF No. 228.)  Alvarez's conduct, like the defendant's conduct here, harmed individuals living in the United States.

---

[9]    *See also United States v. Li*, 24-CR-334 (M.D. Fla.), Hr'g Tr. (ECF 41) at 42 (recognizing need for § 951 sentencings to promote general deterrence, and reasoning "Because certainly the United States of America can, is entitled to, and arguably must convey to citizens, to visitors, and to all others who are interested that those who act against the interests of the United States in the category of offenses that is involved here will be punished in the United States and not in just a formalistic or perfunctory manner.  It is a serious crime to cooperate with a hostile foreign power against the interests of the United States and against the laws of the United States. That seems to me an irreducible minimum for a case such as this.").

Although courts have sentenced certain defendants convicted of Section 951 charges based on their involvement in transnational repression schemes to sentences lower than 60 months' imprisonment, the defendant's conduct here is more blameworthy than that of those defendants. Many of those defendants provided sensitive information to foreign governments about individuals living here in the United States, thus indisputably harming those individuals, but none directly harassed or terrorized their victims. For example:

- *United States v. Li*, 24-CR-334 (M.D. Fla.): Li worked at the direction of officers of the PRC Ministry of State Security over an approximately ten-year period to obtain information of interest to the PRC government, including information concerning dissidents and pro-democracy advocates and members of the Falun Gong religious movement; most of the information he provided was publicly available. Li pleaded guilty to conspiracy to act as an illegal agent of the PRC and was sentenced to 48 months' imprisonment. (ECF No. 39.)

- *United States v. Cabrera Fuentes*, 20-CR-20129 (S.D. Fla.): Cabrera Fuentes acted under the direction and control of a Russian government official to engage in surveillance of a Russian defector. Following the Russian official's instructions, Cabrera Fuentes arranged for an intermediary to lease a unit to the defector in the Miami area; traveled to Miami to obtain the license plate number and parking location of the defector's car to provide to the Russian official on his next trip to Russia; and took a photo of that defector's car, which he sent to the official. Cabrera Fuentes pleaded guilty to violating 18 U.S.C. § 951 and was sentenced to 48 months' imprisonment. (ECF No. 58.)

- *United States v. Abouammo*, No. 19-CR-621 (N.D. Cal.): In return for bribe payments from the Kingdom of Saudi Arabia and the Saudi Royal Family, Abouammo accessed, monitored, and conveyed the confidential user information of anonymous Saudi dissidents held by Twitter. Such information could have been used by the Saudi government to identify and locate the Twitter users who published the posts critical of the regime. After a trial conviction, the Court sentenced Abouammo to 42 months' imprisonment on the Section 951 charge.[10] (ECF No. 426.)

- *United States v. Doostdar*, No. 18-CR-255 (D.D.C.): Doostdar was a dual U.S.-Iranian citizen who traveled to the United States on behalf of the Iranian government. He recruited a second individual to attend a rally in

---

[10]     The Ninth Circuit subsequently vacated the sentence and remanded for resentencing based on an unrelated Guidelines calculation for Abouammo's other offenses of conviction. *See United States v. Abouammo*, No. 22-10348, 2024 WL 4972564 (9th Cir. Dec. 4, 2024).

New York City protesting the Iranian regime.  At the rally, the second individual photographed the protesters and provided those photos to Doostdar.  Doostdar pleaded guilty to conspiracy to act as an illegal foreign agent and acting as an illegal foreign agent and was sentenced to 38 months' imprisonment.  (ECF No. 121.)

- *United States v. Dumeisi*, No. 03-CR-664 (N.D. Ill.):  Dumeisi, who published an Arabic language newspaper from the United States, was recruited by the Iraqi Intelligence Service to collect information regarding individuals and groups considered to be hostile to the Hussein regime.  After conviction by trial of acting as an illegal foreign agent and conspiracy to act as an illegal foreign agent, Dumeisi was sentenced to 46 months' imprisonment.  (ECF No. 138.)

The cases cited by the defendant in his brief as supporting a lower sentence (ECF No. 212 at 28-30) similarly involve facts and circumstances easily distinguishable from the defendant's conduct here.  To start, the defendant cites *United States v. Zhu*, No. 21-CR-265 (S-1) (E.D.N.Y.) (PKC), which involved a defendant convicted at trial of, *inter alia*, violating Section 951 and conspiring to violate Section 951.  Zhu received a significant downward departure of 24 months' imprisonment, which is far from the sentence of time served that the defendant seeks in this case.  At sentencing, Judge Chen primarily attributed the downward departure to the defendant's state of mind, characterizing him as "not a sophisticated person," and "naive and to a large extent, ignorant, about the harm he was causing these victims," and accordingly finding that he "really failed to understand or appreciate the gravity of what he was doing." (Ex. G at 78:17-19, 81:12-82:1, 89:5-7.) Judge Chen expressly cautioned that Zhu should not "be cited as trying to promote unwarranted disparities because," in Judge Chen's view, "there are many factors, personal factors, that . . . are at play here." (*Id.* at 89-90.)  In any event, the reasons Judge Chen cited supporting leniency for Zhu are entirely absent in this case.  The defendant is a sophisticated businessman who repeatedly articulated the benefits he would enjoy if he succeeded in accomplishing John Doe-1's repatriation and clearly understood the harm the scheme was causing (and intended to cause) to John Doe-1 and his family.

The defendant's reliance on *United States v. Chen*, No. 23-CR-286 (S.D.N.Y.), is similarly unavailing.  The defendant argues that, because Chen pleaded guilty to an additional offense and was subject to a two-point enhancement for his role as an organizer, leader, or supervisor of the criminal conduct, that 20-month sentence would not create a sentencing disparity if the defendant were sentenced to time served.  However, Chen's conduct only spanned a period of four months and involved a PRC government scheme to manipulate the Internal Revenue Service's whistleblower program in an effort to strip the tax-exempt status of an entity run and maintained by Falun Gong practitioners – not a forced repatriation scheme that terrorized victims.

Similarly, *United States v. Lin*, No. 15-CR-601 (E.D.N.Y.) (AMD), is readily distinguishable.  In *Lin*, the defendant, who was a counter agent for a PRC-based airline

operating flights from New York City to the PRC, pleaded guilty to a violation of Section 951 for assisting military attaches at the PRC Mission to the United Nations in surreptitiously loading packages onto outbound flights.  Judge Donnelly sentenced her to five years' probation, in large part because the government could not prove the contents of the packages. While Lin did take advantage of her position of employment to serve the interests of the PRC government, unlike the defendant, she did not spend several years trying to locate a purported fugitive of the PRC, harass him and his family through visits to his home, in-person meetings or phone calls with PRC officials, nor did she uncompromisingly communicate harrowing threats at the behest of the PRC to the victims.

Finally, the defendant's contention that this case "did not involve any national security risks" wholly lacks merit.  (ECF No. 212 at 30.)  The defendant's core conduct – aiding a foreign government in carrying out an illegal operation on U.S. soil – threatened U.S. national security interests.  Judge Chen rejected precisely the argument advanced by the defendant, observing, as noted above: "These types of crimes are a threat to this country's national security.  There can be no debate about that[.]"  (Ex. G at 77:1-3.)

V.    Forfeiture, Restitution and Remission

Pursuant to the Court's February 21, 2025 order, the government will provide an update to the Court by March 10, 2025 regarding potential restitution.  The government will also advise the Court at that time regarding forfeiture and, if appropriate, remission, both of which could be affected by restitution discussions with counsel for the defendant and for John Does-1 and -2.

VI.    <u>Conclusion</u>

       For the foregoing reasons, given the serious nature of the criminal scheme and the defendant's role in that scheme – and the threat to U.S. national security posed by the actions of the defendant and his co-conspirators, as well as to the victims who were terrorized because of the conduct of the defendant and his co-conspirators – the government respectfully submits that a sentence of 60 months' imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

Respectfully submitted,

JOHN J. DURHAM
United States Attorney

By:     /s/ _____
Alexander A. Solomon
Meredith A. Arfa
Antoinette N. Rangel
Assistant U.S. Attorneys
(718) 254-7000

Enclosures

cc:    Clerk of Court (KAM) (by ECF and E-mail)
       Defense Counsel (by ECF and E-mail)